1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JACOB JUAREZ SEGURA,                          No. 1:20-cv-00990-DAD-SKO (HC)

12                     Petitioner,                 **FINDINGS AND RECOMMENDATION
                                                    TO DENY PETITION FOR WRIT OF
13           v.                                     HABEAS CORPUS**

14   JOE A. LIZARRAGA, Warden,                      **[THIRTY DAY OBJECTION DEADLINE]**

15                     Respondent.

16

17           Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is currently in state prison serving a

19   sentence of life without the possibility of parole plus three years for felony murder and robbery.

20   The habeas petition presents fourteen claims challenging the conviction. As discussed below, the

21   Court finds the claims to be without merit and recommends the petition be **DENIED.**

22   **I.      PROCEDURAL HISTORY**

23           On November 20, 2014, a Stanislaus County jury found Petitioner guilty of first degree

24   felony murder (Cal. Penal Code §§ 187(a), 190.2(a)(17)) and second degree robbery (Cal. Penal

25   Code § 211). (Doc. 18-8 at 22, 25.[1]) On January 13, 2016, the court sentenced him to a term of

26   life without possibility of parole on the felony murder conviction, plus a consecutive three-year

27   term on the robbery conviction. Id.

28   _____
     [1] Unless otherwise noted, references are to ECF pagination.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On June 27, 2019, the Fifth DCA affirmed the judgment in its entirety. People v. Koplen, No. F073136, 2019 WL 2647356 (Cal. Ct. App. 2019), *as modified on denial of reh'g* (July 19, 2019), *review denied* (Oct. 9, 2019); (Doc. 18-38.) Petitioner filed a petition for review in the California Supreme Court, and the petition was denied on October 9, 2019. (Doc. 18-42.) Petitioner also filed a petition for writ of habeas corpus in the Stanislaus County Superior Court on July 8, 2020. (Doc. 18-43.)

On July 15, 2020, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on October 21, 2020. (Doc. 17.) On November 20, 2020, Petitioner filed a request for extension of time to file a traverse to Respondent's answer. (Doc. 19.) On November 25, 2020, the Court granted an extension of time of sixty (60) days to file a traverse. Petitioner has not filed a traverse, and the time to do so has expired.

## II.     FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

We summarize the material trial evidence. We provide additional facts later in this opinion when relevant for specific issues.

**I. The First Incident At The Park (Alex's Robbery/Count II).**

The first incident occurred when Alex S. [Fn.3] arrived at a park in Modesto, California, to take home his teenaged girlfriend and her sister. The sisters had been drinking alcohol with appellants, and one sister was passed out on a park bench. Upon Alex's arrival, Segura challenged him to a fight, and Segura threw the first punch. When Alex tried to walk away, Segura attacked him, knocking him to the ground. Segura called for help, and both Garcia and Koplen joined the fight, which moved onto a street near the park. [Fn.4] Alex fell to the ground and appellants took turns striking him. According to Alex, he tried to get up, but he was knocked down again by Garcia and Segura.

[Fn.3] We omit Alex's last name to protect his privacy.

[Fn.4] Alex told the jury Garcia and Koplen looked somewhat confused when Segura called them to join in the fight.

Alex had a cell phone and a knife inside the front pocket of his hooded sweatshirt. Those two items fell from his pocket while he was being attacked. At some point

---

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

during this altercation, either Koplen, Garcia and/or Segura took possession of Alex's phone and knife. [Fn.5] The following day, law enforcement recovered Alex's phone at Koplen's residence. About three and a half months after this fatal night, Alex's knife was recovered in bushes near the park. DNA testing confirmed this knife was used in the subsequent murder.

[Fn.5] On appeal, Garcia and Segura assert it was Koplen who took possession of Alex's property. Koplen denies knowing Alex's property had fallen, asserting Garcia and Segura were on top of Alex, blocking his view.

The testimony was in conflict regarding the duration of appellants' attack. Some witnesses, including Alex, believed Garcia and Koplen were not involved in the fight very long, and Koplen was the first to stop. In contrast, two witnesses, Amber and her son Omar, informed the jury that all three appellants continued to attack Alex until their attack was interrupted. [Fn.6] The jury learned that Amber and Omar had driven to the park to help Alex. Before Alex went to the park to retrieve his girlfriend and her sister, he had called his friend Omar to come get him "in case something happened." Alex told the jury that he had called Omar because he knew appellants "were gangsters and drunk." Amber and Omar testified that they interrupted the fight when they arrived in a vehicle. At that point, appellants were all striking Alex. According to Amber and Omar, Alex was lying in a fetal position in the middle of a street next to the park. All three appellants were kicking and punching Alex, who was still on the ground. At trial, Omar testified he did not see either a phone or a knife on the ground. According to Amber, Alex stood up and she did not see anything on the ground.

[Fn.6] To protect their privacy, and to avoid confusion, we omit Amber's and Omar's last names.

Alex and his girlfriend got into Amber's vehicle, and they were driven away. They quickly realized, however, the other sister was still in the park. Amber drove back to retrieve her. Upon returning, one appellant (likely Segura with a red plaid shirt) acted like he wanted to continue fighting. He reached for his belt, acting like he had a knife, but he never showed a weapon.

Amber exited the vehicle and went to retrieve the passed-out sister. Near a park bench, she told two appellants (likely Koplen and Garcia) that she did not "want any drama," and she was taking the girl. One or both of these appellants helped carry the passed-out sister to Amber's vehicle. [Fn.7] Alex and the two sisters were driven away without further incident.

[Fn.7] Some of Amber's testimony may have suggested that Garcia was nice and polite to her while Koplen seemed angry and was vulgar.

At trial, Alex testified he had realized his knife was missing before he got into Amber's vehicle. He said he may have heard his phone fall out during the altercation, but he was not sure. According to Alex, "everything was just happening too fast." According to a detective, Alex reported he had heard his phone and knife fall out of his hoodie when all three appellants knocked him to the ground. Around the time Amber's vehicle arrived, Alex had realized his phone and knife were missing.

At about 8:24 p.m., a neighbor called 911 to report this first incident.

/////
/////
/////

3

**II. The Second Incident At The Park (The Murder Of Tylor/Count I And The Attempted Robberies Of Tylor And Brittany/Counts III And IV).**

While the incident with Alex was occurring, the other two victims, Tylor Crippen and his girlfriend, Brittany W., [Fn.8] were on the other side of the park. Earlier in the evening, Tylor and Brittany had walked past the park and they had stopped near a bus stop. They stood there about 10 or 15 minutes, holding hands and kissing. At trial, Brittany described Tylor as very quiet and shy. He was "really short" and "really petite."

> [Fn.8] We omit Brittany's last name to protect her privacy.

Less than six minutes after the incident with Alex, appellants emerged from the park and approached Tylor and Brittany. Tylor had his back to appellants as they approached. One appellant asked them for a cigarette. [Fn.9] After Tylor and Brittany said they did not smoke, the same appellant punched Tylor in his back. Tylor ran into the park. As he ran, he yelled, "Leave her alone." The other two appellants chased him, and one yelled they were going to cut off his "dick." [Fn.10]

> [Fn.9] Trial evidence suggested Koplen smoked cigarettes. At trial, the prosecution's gang expert opined that asking for a cigarette was a "ruse" designed to lower Tylor's and Brittany's guard.

> [Fn.10] The jury heard conflicting testimony regarding the sequence of when the two suspects chased Tylor. At trial, Brittany agreed on cross-examination that the two suspects "immediately" chased Tylor when he ran. However, according to a detective, Brittany initially reported the two suspects did not chase after Tylor until he had crossed the street and entered the park.

The remaining appellant threatened Brittany with a knife. He ordered her to give him everything she had. After showing him she had nothing, he said, "Stay there, bitch." Brittany's assailant then also ran after Tylor. A short time later, Brittany heard Tylor scream in pain and call out her name from inside the park.

Brittany sought assistance at a nearby house, pounding on its front door. Appellants reappeared, walking from the park. One told her to "go back inside [your] house, bitch." This suspect was wearing "a black pullover" and he did not have long hair. He lifted his shirt and Brittany saw an apparent gun handle. She fell to her knees and begged them not to hurt her. Appellants fled when a residence's owner opened the front door. At about 8:30 p.m. (six minutes after the first 911 call), the resident called 911 and handed the phone to Brittany, who reported the second incident.

**III. Tylor's Body Is Discovered.**

At about 8:39 p.m., a responding police officer found Tylor inside the park lying unresponsive in a pool of blood. His pulse was very weak. He was taken to a hospital by ambulance. He was declared dead at about 9:18 p.m. Tylor died due to blood loss from stab wounds to his heart and liver. He also suffered a third superficial cut to his torso.

At trial, the pathologist opined Tylor could have walked a short distance after he was stabbed. A hip abrasion suggested Tylor had fallen. The pathologist saw no other evidence of bruising.

Tylor was 18 years old when he died. He was just under five feet two inches tall,

and he weighed about 134 pounds. [Fn.11] During closing argument, the prosecutor asserted appellants killed Tylor for his phone. Tylor was carrying a cell phone when he walked to the park. During its investigation, law enforcement located a cell phone in the park a short distance from where Tylor was found.

> [Fn.11] In contrast to Tylor's small stature, Koplen was five feet 11 inches tall and weighed about 185 pounds. Garcia was five feet seven inches tall and weighed about 160 pounds. Segura was six feet tall and weighed about 165 pounds.

**IV. Appellants are arrested.**

At about the same time an officer was locating Tylor in the park, another officer spotted Segura walking on a street near the park. Segura matched dispatch's description of a stabbing suspect wearing a red plaid shirt. At gunpoint, an officer ordered Segura to lie down. Segura initially complied, but he then fled despite the officer's commands to stop. Segura was taken into custody a short time later after he fell while running. He did not have any weapons on him. His hands were bloody, and he had skin missing from his knuckles. He had a black, white and red plaid shirt either tied around his waist or tucked in his waistband.

Very early the next morning, officers arrested Koplen and Garcia without incident at their respective residences.

**V. The Forensic Evidence.**

Forensic evidence linked both Koplen and Garcia to Tylor's murder in count I. Tylor's DNA profile was a major contributor to some apparent blood found on one of Garcia's shoes. [Fn.12] In addition, Tylor's DNA profile was a major contributor to some apparent blood found on Koplen's right ring finger. Tylor's DNA profile also matched an apparent blood stain found on an area of Koplen's jeans. Law enforcement had recovered these jeans in Koplen's residence.

> [Fn.12] Garcia had two light blood stains on his shoe. It is possible this blood was transferred to his shoe from another source, such as grass.

Forensic evidence also linked Garcia to Alex's robbery in count II. Alex's DNA was a major contributor to apparent blood taken from Garcia's left hand. In addition, Alex's DNA was a major contributor to a "very, very small" blood stain on the right leg of Garcia's jeans.

No forensic evidence linked Segura to the charged crimes. His black undershirt, however, had human blood on its front left cuff. This blood stain had a mixture of DNA from at least three contributors, and it was too complex for interpretation. [Fn.13]

> [Fn.13] Segura's own blood was found on his hands, jeans and his plaid shirt. Tylor's DNA did not contribute to these blood stains.

**VI. Alex's Knife, Which Was Used In Tylor's Homicide, Is Recovered.**

About three and a half months after these crimes, a resident near the park found a knife in some bushes, which law enforcement collected. DNA testing confirmed this knife was used to stab Tylor.

At trial, Alex identified this knife as his and the one taken during his incident with appellants. The pathologist testified this knife was consistent with all three of Tylor's stab wounds.

**VII. Brittany's Inconsistent Statements About The Identity Of Her Assailant.**

During trial, a dispute arose regarding the identity of Brittany's assailant. On the fatal night, Brittany gave two separate statements to law enforcement. Both times she said her assailant wore a red plaid shirt. She did not describe any other distinguishing features. Brittany's initial identifications tended to indicate Segura, who had worn a red plaid shirt (which also had other colors) when these crimes occurred.

About eight days after these crimes, Brittany again told a detective her assailant had worn a red plaid shirt. However, she also stated her robber had long hair and a ponytail. On that fatal night, only Koplen had long hair worn in a ponytail.

At trial, Brittany testified her assailant was the longer-haired male with the ponytail. She believed the longer-haired male was wearing red plaid, but she was not certain. On recross-examination (with Koplen's trial counsel), Brittany agreed her assailant was the same person wearing red whom she had described in her three interviews with law enforcement. On redirect examination, however, she said she thought the one in red plaid was "a different person" from the male with the ponytail.

Koplen, 2019 WL 2647356, at *2-5.

III.     DISCUSSION

A.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

/////

6

B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Cullen v. Pinholster, 563 U.S. 170, 203 (2011).  The petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'"  Shinn v. Kayer, ___ U.S. ___, ___ , 141 S.Ct. 517, 523, 2020 WL 7327827, *3 (2020) (quoting Virginia v. LeBlanc, 582 U. S. ___, ___, 137 S.Ct. 1726, 1728 (2017) (per curiam)).  Rather, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility of fairminded disagreement*."  Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 141 S.Ct. at 523, 2020 WL 7327827, *3.  Congress "meant" this standard to be "difficult to meet."  Richter, 562 U.S. at 102.

The second prong pertains to state court decisions based on factual findings.  Davis v.

1  Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

2  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

3  petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

4  facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539

5  U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's

6  factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

7  among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

8  1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

9         To determine whether habeas relief is available under § 2254(d), the federal court looks to

10  the last reasoned state court decision as the basis of the state court's decision. See Ylst v.

11  Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

12  2004). "[A]lthough we independently review the record, we still defer to the state court's

13  ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

14        The prejudicial impact of any constitutional error is assessed by asking whether the error

15  had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

16  Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

17  (holding that the Brecht standard applies whether or not the state court recognized the error and

18  reviewed it for harmlessness).

19        C.    Review of Petition

20        Petitioner raises fourteen claims in his petition: 1) Insufficient evidence supported the

21  robbery of Alex S.; 2) Insufficient evidence supported the felony murder conviction; 3)

22  Insufficient evidence supported the robbery special circumstance; 4) The special circumstance

23  instruction was constitutionally infirm; 5) Trial court committed instructional error concerning the

24  "escape rule," "continuous transaction rule," and "logical connection"; 6) Prosecutor committed

25  misconduct in misstating the law; 7) Instructional error concerning the elements for aiding and

26  abetting robbery; 8) Instructional error concerning voluntary intoxication; 9) Prosecutor

27  committed misconduct, and Petitioner's counsel was ineffective, when forensic evidence was

28  misstated; 10) Prosecutor committed misconduct during closing argument; 11) Trial court erred in

8

refusing to instruct on lesser-included homicide offenses and on assault and battery as lesser offense to robbery; 12) Trial court erroneously admitted testimonial hearsay; 13) Trial court erred in refusing to order bifurcation of the gang allegations; and 14) Cumulative error.

    1.    Insufficiency of the Evidence – Robbery of Alex S.

Petitioner first alleges there was insufficient evidence to support the verdict for robbery of Alex S. Petitioner presented this claim on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

**V. Substantial Evidence Supports The Verdicts Against Appellants For Robbery Of Alex (Count II).**

Appellants contend their convictions for Alex's robbery (count II) must be reversed for insufficient evidence.

**A. Standard of review.**

As stated previously, we must review the entire record in the light most favorable to the judgment to determine whether substantial evidence exists to support the judgments. Such evidence must be reasonable, credible, and of solid value. (*Ghobrial, supra*, 5 Cal.5th at p. 277.) This standard also applies in cases in which the prosecution relies mainly on circumstantial evidence. (*Id.* at pp. 277–278.)

Although a jury is entitled to make reasonable inferences based on the circumstantial evidence, an inference must not be based on speculation as to probabilities. (*People v. Davis* (2013) 57 Cal.4th 353, 360, 159 Cal.Rptr.3d 405, 303 P.3d 1179.) A reasonable inference may not be based on suspicion, imagination, surmise, conjecture, guesswork or supposition. (*Ibid.*)

**B. Analysis**.

Appellants claim their convictions in count II are based on speculation, and they maintain reasonable inferences establish their innocence. We disagree. Substantial circumstantial evidence, and the reasonable inferences drawn from it, support the jury's verdicts in count II.

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Our Supreme Court makes clear the intent to steal must be formed either before or during the application of force for a robbery to occur. (*People v. Tafoya* (2007) 42 Cal.4th 147, 170, 64 Cal.Rptr.3d 163, 164 P.3d 590.) If the intent to steal occurs after the use of force, the taking is a theft and not robbery. (*People v. Morris* (1988) 46 Cal.3d 1, 19, 249 Cal.Rptr. 119, 756 P.2d 843 (*Morris*), disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6, 37 Cal.Rptr.2d 446, 887 P.2d 527.)

Regarding general accomplice liability, an aider and abettor must have knowledge of the perpetrator's unlawful purpose and act with the intent to assist in the commission of that crime. (*People v. McCoy, supra*, 25 Cal.4th at p. 1118, 108 Cal.Rptr.2d 188, 24 P.3d 1210.) An accomplice must intend to render aid prior to or

during the commission of the offense. (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164, 282 Cal.Rptr. 450, 811 P.2d 742 (*Cooper*).) [Fn.21]

> [Fn.21] In contrast to the usual requirements for liability as an aider and abettor, our Supreme Court has created a different rule for getaway drivers involved in a robbery. A getaway driver "must form the intent to facilitate or encourage commission of the robbery prior to or during the carrying away of the loot to a place of temporary safety." (*Cooper, supra*, 53 Cal.3d at p. 1165, 282 Cal.Rptr. 450, 811 P.2d 742, fn. & italics omitted.) This instruction is embodied in CALCRIM No. 1603, and it was given in this matter. The bench notes to CALCRIM No. 1603 state that a trial court should give this instruction "when the defendant is charged with aiding and abetting a robbery and an issue exists about when the defendant allegedly formed the intent to aid and abet." Our Supreme Court has clarified that, "for the purpose of aiding and abetting, the duration of a robbery extends to the carrying away of the stolen property to a place of temporary safety." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041, 31 Cal.Rptr.2d 128, 874 P.2d 903.)

In this matter, the evidence strongly suggests that Alex's property fell in plain view of all three appellants while they were attacking him. Alex told a detective he heard his phone and knife fall from the front pocket of his hoodie when appellants knocked him down. At trial, Alex testified he had realized his knife was missing before he got into Amber's vehicle. Amber and Omar both told the jury they saw all three appellants kicking and punching Alex when he was still on the ground. Appellants stopped the attack, and neither Amber nor Omar saw Alex's property on the ground.

The evidence overwhelmingly establishes at least one appellant took possession of Alex's phone and knife during this incident. Alex's phone was recovered the following morning inside Koplen's residence. Alex's knife was recovered about three and a half months after this homicide, and Tylor's DNA was on the knife blade. It is clear at least one appellant used Alex's knife to stab Tylor.

Given their coordinated attack, and their immediate proximity to Alex when he was on the ground, the jury could have reasonably inferred appellants were each aware that Alex's property had fallen. The jury could have also reasonably concluded each appellant knew one of them had retrieved Alex's property while they continued to strike him. Reasonable jurors could have determined that, after Alex's property fell and was recovered, appellants worked together and continued to use force to keep Alex on the ground and permanently deprive him of his property. Criminal intent is rarely established by direct evidence and it must usually be inferred from all of the facts and circumstances adduced at trial. (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1380, 7 Cal.Rptr.2d 660; *People v. Williams* (1967) 252 Cal.App.2d 147, 155, 59 Cal.Rptr. 905; see, e.g., § 29.2, subd. (a) ["The intent or intention is manifested by the circumstances connected with the offense."].) The taking of Alex's property during this synchronized use of force strongly infers that each appellant held an intent to rob (or held an intent to aid and abet in robbery).

In addition, Amber returned to the park to retrieve the passed-out sister. All three appellants were present when Amber returned. At no time did any appellant alert either Alex, Amber or Omar that they had Alex's property, or that they wanted to return it. To the contrary, Segura appeared like he wanted to continue fighting. He grabbed his belt and acted like he had a knife. When he was later arrested, however, Segura was unarmed.

Moreover, Tylor's and Brittany's attempted robberies (counts III and IV,

10

respectively) occurred mere minutes after Alex's property was taken (count II). In both of these criminal incidents, appellants worked together to subdue and control the victims. Alex's property was taken while all three appellants beat him. Garcia and Segura pursued Tylor while Koplen threatened Brittany with a knife and demanded her property. The evidence overwhelmingly suggests that Koplen threatened Brittany while using Alex's knife. When chasing Tylor, either Garcia or Segura yelled that they would cut him. After Tylor was stabbed, all three appellants returned to further intimidate Brittany.

The cumulative evidence strongly suggests that appellants held an intent to rob the three victims during these two separate criminal incidents. (See, e.g., *People v. Daya* (1994) 29 Cal.App.4th 697, 708–709, 34 Cal.Rptr.2d 884 [in a circumstantial case, the evidence is viewed cumulatively to determine if a reasonable jury could find guilt beyond a reasonable doubt].) Appellants' synchronized actions throughout this crime spree would not have been lost on the jury. The jurors were entitled to draw reasonable inferences based on the circumstantial evidence (*People v. Livingston, supra*, 53 Cal.4th at p. 1166, 140 Cal.Rptr.3d 139, 274 P.3d 1132) and we must presume every inference in support of the judgment the finder of fact could reasonably have made. (*People v. D'Arcy, supra*, 48 Cal.4th at p. 293, 106 Cal.Rptr.3d 459, 226 P.3d 949.)

It was the jury, and not this court, which must be convinced of appellants' guilt beyond a reasonable doubt. (*People v. Bean* (1988) 46 Cal.3d 919, 933, 251 Cal.Rptr. 467, 760 P.2d 996.) In finding appellants guilty of robbing Alex, the jury rejected the lesser included offense of theft (§§ 484, subd. (a), 487, subd. (c)). The circumstances reasonably justify the jury's verdicts. The jury had sufficient substantial evidence to determine each appellant formed an intent to rob or aid in robbery while they beat Alex. The circumstantial evidence connects each appellant to Alex's robbery, and proves each appellant's guilt beyond a reasonable doubt. Consequently, we will not reverse the judgments even if the circumstances raise contrary inferences. (See *People v. Bean, supra*, 46 Cal.3d at p. 933, 251 Cal.Rptr. 467, 760 P.2d 996.)

Finally, appellants rely primarily on two opinions, *Rodriguez v. Superior Court* (1984) 159 Cal.App.3d 821, 205 Cal.Rptr. 750 (*Rodriguez*) and *Morris, supra*, 46 Cal.3d 1, 249 Cal.Rptr. 119, 756 P.2d 843. These authorities do not assist them.

In *Rodriguez, supra*, 159 Cal.App.3d 821, 205 Cal.Rptr. 750, a rape victim left her purse in the defendant's car when he forced her out to rape her. He then drove off with the purse after the rape. (*Id.* at p. 823, 205 Cal.Rptr. 750.) The appellate court found insufficient evidence of robbery. No evidence showed the defendant had been aware of the purse before forcibly separating the victim from it. Instead, the defendant's intent was on sexual gratification. (*Id.* at p. 827, 205 Cal.Rptr. 750.)

In *Morris, supra*, 46 Cal.3d 1, 249 Cal.Rptr. 119, 756 P.2d 843, a murder victim was shot to death. Circumstantial evidence linked the defendant to the crime scene. After this murder, the defendant tried to use a credit card previously loaned to the victim. (*Id.* at pp. 10–11, 249 Cal.Rptr. 119, 756 P.2d 843.) In addition to murder, a jury convicted the defendant of robbery and found true a robbery-murder special-circumstance allegation. (*Id.* at p. 9, 249 Cal.Rptr. 119, 756 P.2d 843.) The Supreme Court, however, determined it was impossible to know whether the defendant took the credit card from the victim before or during the murder. It was also impossible to know whether the taking was accomplished with force or fear. (*Id.* at p. 20, 249 Cal.Rptr. 119, 756 P.2d 843.) The Supreme Court reversed the robbery conviction and the murder special-circumstance finding. (*Id.* at p. 21, 249 Cal.Rptr. 119, 756

P.2d 843.)

Both *Rodriguez* and *Morris* are distinguishable. In contrast to these authorities, appellants jointly applied force to Alex while his property was taken. The circumstantial evidence strongly suggests appellants intended to rob Alex or aid in the commission of robbery. The jury had substantial evidence to find appellants guilty. Neither *Rodriguez* nor *Morris* dictate reversal.

Based on this record, one appellant took Alex's property from his immediate presence and against his will through force with the intent to permanently deprive him of his property. (§ 211.) The other appellants aided and abetted in that taking with the intent to commit robbery. The evidence supporting these inferences is reasonable, credible, and of solid value. As such, a reasonable trier of fact could find each appellant guilty of robbery beyond a reasonable doubt. (See *Ghobrial, supra*, 5 Cal.5th at p. 277.) Accordingly, substantial evidence supports the verdicts in count II and this claim fails. [Fn.22]

[Fn.22] Appellants also assert substantial evidence did not support the trial court's denial of a motion to acquit pursuant to section 1118.1. We reject that assertion. The prosecution's case established appellants' guilt for Alex's robbery.

*Koplen*, 2019 WL 2647356, at *18-20.

### a. Legal Standard

The law on sufficiency of the evidence is clearly established. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of

Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

### b.    Analysis

A federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at 324 n. 16.  Petitioner claims there was insufficient evidence to support his conviction for robbery. As noted by the appellate court, "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  Koplen, 2019 WL 2647356, at *18 (quoting Cal. Penal Code § 211). Under California law, the intent to steal must be formed either before or during the application of force for a robbery to occur.  Id. (citing People v. Tafoya, 42 Cal.4th 147, 170 (2007).

The Fifth DCA noted the existence of strong circumstantial evidence from which the jury could have determined that the defendants intended to rob Alex, and did in fact rob him.  The evidence showed that Alex's phone and knife fell from his pocket when defendants knocked him to the ground.  Defendants then proceeded to kick and beat Alex in concert.  When they ceased their attack, the phone and knife were nowhere to be seen.  The evidence further showed that one of the defendants took possession of the phone and knife, given that the phone was located inside

one of the defendants' homes, and the knife was located three and a half months later with the other victim's blood on it. From this evidence, a rational juror could have concluded that the defendants formed an intent to rob Alex or aid in the robbery before or during the attack, and that Petitioner or a co-defendant took possession of the phone and knife during the attack.

Viewing the evidence in the light most favorable to the prosecution, Petitioner fails to show that no rational trier of fact would have agreed with the state court's determination. Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, the <u>Jackson</u> standard. The claim should be denied.

2.      Insufficiency of the Evidence – Felony Murder Conviction and Robbery Special Circumstance

Petitioner was convicted of felony murder with a finding that the murder was committed during an attempted robbery. In his second and third claims, Petitioner alleges that the evidence was insufficient to support the felony murder conviction and the special circumstance finding. These claims were raised on direct appeal, and in the last reasoned decision, the Fifth DCA denied the claim as follows:

**I. It Is Beyond Any Reasonable Doubt That The Jury Based The Felony-Murder Convictions On The Attempted Robbery Of Tylor Or Brittany.**

Despite finding true the special circumstance allegations that Tylor's murder occurred during an attempted robbery, the jury acquitted Garcia and Segura of attempted robbery in counts III and IV. Throughout much of their briefing, Garcia and Segura focus on the jury's inconsistent verdicts. They argue that, because of the inconsistent verdicts, their respective felony-murder convictions were likely based on Alex's robbery (count II). This assumption is critical to many of their arguments below.

This record, however, does not support Garcia's and Segura's position. Despite the inconsistent verdicts, we can declare beyond any reasonable doubt that the felony-murder convictions were based on the attempted robbery of Tylor or Brittany. Our conclusion is based on the following.

**A. The relevant jury instructions.**

The court informed the jury that felony murder could be based on either robbery or attempted robbery. The court stated the special circumstance allegations applied if the prosecution proved beyond a reasonable doubt appellants acted with either an intent to kill or with reckless indifference to human life, and they were a major participant in robbery or its attempt.

With CALCRIM No. 3500, the court provided the jury with a unanimity instruction

14

regarding the special circumstance allegations. The jurors were told appellants were charged in count I with first degree murder under a theory of felony murder. "The People have presented evidence of more than one attempted robbery. To prove a defendant guilty of Count I, you must all agree which attempted robbery was committed." We presume the jurors understood and applied this instruction. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940, 126 Cal.Rptr.3d 1, 253 P.3d 185.)

**B. The relevant closing arguments.**

At no time did the prosecutor argue or reasonably suggest Alex's robbery (count II) was the underlying crime supporting felony murder. Instead, during closing argument, the prosecutor repeatedly asserted that felony murder was based on the attempted robbery of Tylor or Brittany (counts III and IV, respectively). The prosecutor emphasized that the incident involving Alex was separate from the incident involving Tylor and Brittany. She contended the special circumstance allegations under section 190.2 applied because Tylor's murder occurred during an attempted robbery.

During rebuttal, the prosecutor again declared that felony murder was based on the attempted robbery of Tylor or Brittany (counts III and IV, respectively). She argued the intent to rob either Brittany or Tylor was sufficient for felony murder. "The person who dies does not have to be the person who is robbed as long as it's one continuous course of conduct and transaction." She contended it did not matter which appellant stabbed Tylor because appellants acted in concert. However, she asserted Koplen was the one who had stabbed Tylor, and Garcia and Segura had chased him.

In addition to the prosecutor's comments, Segura's trial counsel repeatedly noted during closing argument that the prosecution's theory of felony murder, and the special circumstance allegations, were based on the attempted robberies of Tylor or Brittany. In addition, Koplen's counsel argued that "[t]his case rests entirely on the intent of the non-stabbers to rob." He contended one appellant killed Tylor, but it was impossible to know who did the stabbing. He claimed this showed reasonable doubt. Garcia's counsel asserted his client had no knowledge Tylor and Brittany were going to be robbed. His counsel argued Garcia could not be liable for felony murder in count I, or attempted robbery in counts III and IV.

The arguments from counsel, and especially from the prosecutor, made it abundantly clear that the theory of felony murder was based solely on the attempted robbery of either Tylor or Brittany (counts III and IV, respectively). At no time did any counsel assert or reasonably suggest Alex's robbery (count II) was the basis for felony-murder liability.

**C. The jury's special circumstance findings.**

The prosecution alleged a special circumstance enhancement under section 190.2, subdivision (a)(17)(A). During a hearing regarding this verdict form, the prosecutor asserted felony murder was based solely on the alleged attempted robberies.

The jury found Tylor's murder "was committed or aided and abetted" by all three appellants "*while the said defendant was engaged in the commission of the crime of ATTEMPTED ROBBERY*, a special circumstance," within the meaning of section 190.2, subdivision (a)(17)(A).

# D. Conclusion.

Based on this record, we reject Garcia's and Segura's repeated claims that Alex's robbery (count II) could be the underlying felony supporting their convictions for first degree felony murder (count I). To the contrary, it is beyond any reasonable doubt that the felony-murder convictions in this matter were based on the attempted robbery of Tylor or Brittany (counts III and IV, respectively). The unanimity instruction under CALCRIM No. 3500 directed the jury to focus only on attempted robbery. The prosecution repeatedly asserted that the theory of felony murder was based only on Tylor's or Brittany's attempted robbery. Finally, based on their true findings, the jurors unanimously agreed the prosecution had proven beyond a reasonable doubt Tylor's murder occurred during an attempted robbery. The jury's true findings overwhelmingly establish that the felony-murder convictions were based on attempted robbery of Tylor or Brittany (counts III or IV, respectively) and not on Alex's robbery (count II).

Although the jury provided inconsistent verdicts in this matter, inherently inconsistent verdicts are generally allowed to stand. (*United States v. Powell* (1984) 469 U.S. 57, 64–69, 105 S.Ct. 471, 83 L.Ed.2d 461; *People v. Avila* (2006) 38 Cal.4th 491, 600, 43 Cal.Rptr.3d 1, 133 P.3d 1076; *People v. Lewis* (2001) 25 Cal.4th 610, 656, 106 Cal.Rptr.2d 629, 22 P.3d 392.) When a jury renders an inconsistent verdict, a criminal defendant is nevertheless protected "'against jury irrationality or error'" by an independent review of the sufficiency of the evidence. (*People v. Palmer* (2001) 24 Cal.4th 856, 863, 103 Cal.Rptr.2d 13, 15 P.3d 234.) When conducting such a review, an appellate court must assess whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. This review is independent of the jury's determination that evidence on another count was insufficient. (*Ibid.*)

Here, having determined beyond a reasonable doubt that the jury based its felony-murder convictions on the attempted robbery of Tylor or Brittany, we must address whether substantial evidence supports Garcia's and Segura's respective convictions for felony murder. As we explain, substantial evidence supports all of the convictions in this matter.

## II. Substantial Evidence Supports Garcia's And Segura's Convictions For Felony Murder (Count I) And The True Findings In The Special Circumstance Murder Allegations.

Garcia and Segura contend insufficient evidence supports their respective convictions for first degree felony murder (count I) and the jury's special circumstance true findings under section 190.2, subdivision (a)(17)(A). They seek reversal of these convictions and findings.

### A. Standard of review.

To resolve a claim involving the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether substantial evidence exists. Substantial evidence is reasonable, credible, and of solid value so that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 277, 234 Cal.Rptr.3d 669, 420 P.3d 179 (*Ghobrial*).) This standard is applied in cases in which the prosecution relies mainly on circumstantial evidence. (*Id.* at pp. 277–278.) This standard also applies when reviewing a jury's true finding on a special circumstance allegation. (*People v. Banks* (2015) 61 Cal.4th 788, 804, 189 Cal.Rptr.3d 208, 351 P.3d 330

(*Banks*).)

**B. Analysis.**

Garcia and Segura claim they had a chance encounter with Tylor and Brittany, and nothing establishes their intent to rob them. They argue no evidence shows they aided and abetted Koplen. They further contend insufficient evidence supports the findings that Tylor's murder fell under section 190.2. They assert no evidence establishes (1) they had an intent to kill; (2) they were major participants in a robbery or attempted robbery that resulted in death; or (3) they acted with reckless indifference to human life.

These contentions are without merit. The jury had substantial evidence to convict Garcia and Segura of felony murder and find true the special circumstance murder allegations.

**1. An overview of felony murder.**

In California, all murder committed in the perpetration of or attempt to perpetrate certain enumerated felonies, including robbery, is first degree murder. (§ 189, subd. (a); *People v. Cavitt* (2004) 33 Cal.4th 187, 197, 14 Cal.Rptr.3d 281, 91 P.3d 222 (*Cavitt*).) For felony murder, the mental state required is the specific intent to commit the underlying felony. (*Cavitt, supra*, 33 Cal.4th at p. 197, 14 Cal.Rptr.3d 281, 91 P.3d 222.)

For general accomplice liability, the prosecution must prove that a defendant acted with knowledge of the perpetrator's unlawful purpose and with the intent or purpose of committing, facilitating or encouraging commission of the crime. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118, 108 Cal.Rptr.2d 188, 24 P.3d 1210.) The actus reus for accomplice liability to first degree felony murder is aiding and abetting the underlying felony or its attempt. (*People v. Clark* (2016) 63 Cal.4th 522, 615, 203 Cal.Rptr.3d 407, 372 P.3d 811 (*Clark*).) The mens rea for an aider and abettor is the same as the intent for the actual killer. [Fn.14] (*Clark*, at p. 615, 203 Cal.Rptr.3d 407, 372 P.3d 811.)

> [Fn.14] Effective January 1, 2019, the Legislature amended "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f), p. 6674; Sen. Bill No. 1437 (2017-2018 Reg. Sess.).) We discuss this amendment in greater detail in Section III below.

**2. An overview of the murder special-circumstance allegations.**

A conviction for first degree murder may result in a prison term of 25 years to life. (§ 190, subd. (a).) However, if at least one special circumstance allegation is found true, a defendant may receive the death penalty or LWOP. (§ 190.2, subd. (a).)

For a nonkiller, a penalty of death or LWOP may be imposed under two circumstances. First, a defendant, with the intent to kill, must aid or abet any actor in the commission of first degree murder. (§ 190.2, subd. (c).) In the alternative, a defendant must act "with reckless indifference to human life and as a major participant" while aiding and abetting in the commission (or its attempt) of certain

enumerated felonies, including robbery. (§ 190.2, subds. (a)(17)(A), (d).)

## a. The "major participant" requirement.

The "major participant" requirement means a defendant's personal involvement must be "substantial" and greater than the actions of an ordinary aider and abettor to an ordinary felony murder. (*Banks, supra*, 61 Cal.4th at pp. 798, 802, 189 Cal.Rptr.3d 208, 351 P.3d 330.) The ultimate question "is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major" [citations].'" (*Clark, supra*, 63 Cal.4th at p. 611, 203 Cal.Rptr.3d 407, 372 P.3d 811, quoting *Banks, supra*, at p. 803, 189 Cal.Rptr.3d 208, 351 P.3d 330.)

Our Supreme Court has cited the following list of nonexclusive circumstances to consider when analyzing whether a defendant acted as a major participant: (1) What role did the defendant have in planning the criminal enterprise, or in supplying or using lethal weapons? (2) What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? (3) Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? (4) What did the defendant do after lethal force was used? (*Clark, supra*, 63 Cal.4th at p. 611, 203 Cal.Rptr.3d 407, 372 P.3d 811; *Banks, supra*, 61 Cal.4th at p. 803, 189 Cal.Rptr.3d 208, 351 P.3d 330.) No single factor is necessary, but neither is any one of them necessarily sufficient. Instead, all may be weighed in determining whether a defendant acted as a major participant. (*Banks, supra*, 61 Cal.4th at p. 803, 189 Cal.Rptr.3d 208, 351 P.3d 330.)

## b. The "reckless indifference" requirement.

For the "reckless indifference" requirement, a defendant must hold an awareness that his or her participation in the felony involved a grave risk of death. (*Banks, supra*, 61 Cal.4th at p. 807, 189 Cal.Rptr.3d 208, 351 P.3d 330.) This requires more than the foreseeable risk of death inherent in any armed crime. (*Id*. at p. 808, 189 Cal.Rptr.3d 208, 351 P.3d 330.) Instead, the defendant must consciously disregard a substantial and unjustifiable risk of death. (*Clark, supra*, 63 Cal.4th at p. 617, 203 Cal.Rptr.3d 407, 372 P.3d 811.) However, an objective standard is used, and a reviewing court asks whether the defendant's behavior was a "'gross deviation'" from what a law-abiding person would have done under the circumstances. (*Ibid*.) The issue is whether the defendant exhibited a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant did not specifically desire for death to occur. (*Ibid*.)

Acknowledging an overlap between the "major participant" and "reckless indifference" elements (*Clark, supra*, 63 Cal.4th at pp. 614–615, 203 Cal.Rptr.3d 407, 372 P.3d 811), the California Supreme Court has considered the following factors in determining whether a defendant acted with reckless indifference to human life: (1) a defendant's knowledge of weapons, and use and number of weapons; (2) a defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the felony; (4) a defendant's knowledge of the cohort's likelihood of killing; and (5) a defendant's efforts to minimize the risks of the violence during the felony. (*Id*. at pp. 618–623, 203 Cal.Rptr.3d 407, 372 P.3d 811.) Like the factors for major participation, no particular factor is necessary nor is any one necessarily sufficient. (*Id*. at p. 618, 203 Cal.Rptr.3d 407, 372 P.3d 811.)

### 3. A summary of *Enmund*, *Tison*, and *Banks*.

We summarize three important opinions: (1) *Enmund v. Florida* (1982) 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (*Enmund*); (2) *Tison v. Arizona* (1987) 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (*Tison*); and (3) *Banks, supra*, 61 Cal.4th 788, 189 Cal.Rptr.3d 208, 351 P.3d 330.

### a. *Enmund, supra*, 458 U.S. 782, 102 S.Ct. 3368.

In *Enmund, supra*, 458 U.S. 782, 102 S.Ct. 3368, the United States Supreme Court held the death penalty was inappropriate for an accomplice who did not kill, attempt to kill, intend a killing take place or intend for lethal force to be employed. (*Id*. at p. 797, 102 S.Ct. 3368.) The high court emphasized the focus must be on the accomplice's culpability and not on the murderer's culpability. (*Id*. at p. 798, 102 S.Ct. 3368.) The defendant in *Enmund* was the getaway driver in an armed robbery of a dwelling whose occupants were murdered. The defendant was convicted of two counts of first degree murder and sentenced to death. (*Id*. at pp. 784–785, 102 S.Ct. 3368; see *Tison, supra*, 481 U.S. at p. 146, 107 S.Ct. 1676.) *Enmund* reversed the defendant's judgment upholding the death penalty because the state had failed to treat his culpability differently from the actual killers' culpability. (*Enmund, supra*, at pp. 798, 801, 102 S.Ct. 3368.)

### b. *Tison, supra*, 481 U.S. 137, 107 S.Ct. 1676.

In *Tison*, two brothers aided a prison escape by arming two murderers, one of whom they knew had killed in the course of a previous escape attempt. After the breakout, one brother flagged down a passing car, and both fully participated in kidnaping and robbing the vehicle's occupants. Both stood by and watched as those people were killed. The brothers made no attempt to assist the victims before, during, or after the shooting, but continued to assist the killers. (*Tison, supra*, 481 U.S. at pp. 151–152, 107 S.Ct. 1676.) The Supreme Court held the brothers could be sentenced to death despite the fact they had not committed the killings or intended to kill. (*Id*. at p. 158, 107 S.Ct. 1676.) The brothers had a substantial involvement in the crimes and they did not act as mere getaway drivers. (*Ibid*.) Instead, they were "actively involved in every element" of the underlying felonies, and they were physically present during the entire sequence of criminal activity culminating in the murders. (*Ibid*.) The brothers' "high level of participation" implicated them in the resulting deaths. (*Ibid*.)

### c. *Banks, supra*, 61 Cal.4th 788, 189 Cal.Rptr.3d 208, 351 P.3d 330.

In *Banks*, our high court noted that felony-murder participants may be placed on a continuum. (*Banks, supra*, 61 Cal.4th at pp. 800–802, 811, 189 Cal.Rptr.3d 208, 351 P.3d 330.) On one end of the continuum, for example, is the getaway driver who was "'not on the scene, who neither intended to kill nor was found to have had any culpable mental state,'" and who is not eligible for the death penalty or LWOP. (*Id*. at p. 800, 189 Cal.Rptr.3d 208, 351 P.3d 330.) At the other end of the continuum is the actual killer, or an aider and abettor, who attempted or intended to kill, and who is eligible for LWOP. (*Ibid*.)

In *Banks*, the defendant was sentenced to LWOP as a result of a felony-murder special circumstance. He was the getaway driver for an armed robbery. He was not present when a security guard was shot and killed. (*Banks, supra*, 61 Cal.4th at pp. 795–796, 189 Cal.Rptr.3d 208, 351 P.3d 330.) Our Supreme Court concluded the

defendant was ineligible for LWOP. (*Id*. at p. 794, 189 Cal.Rptr.3d 208, 351 P.3d 330.) The defendant had not been a major participant in the crime. (*Id*. at p. 805, 189 Cal.Rptr.3d 208, 351 P.3d 330.) There was no evidence the defendant had procured the weapons, or the defendant and his confederates had previously committed any other violent crime. When the killing was committed, the defendant was not at the scene, he did not see or hear the shooting, and he had no immediate role in instigating the shooting. There was no evidence he could have prevented the shooting. (*Ibid*.) Based on *Enmund* and *Tison*, our high court held that participation in an armed robbery, without more, was not sufficient for an enhanced penalty of death or LWOP. (*Banks, supra*, at p. 805, 189 Cal.Rptr.3d 208, 351 P.3d 330.)

### 4. Garcia's and Segura's actions in this matter.

Despite the inconsistent verdicts, substantial evidence supports the jury's convictions of Garcia and Segura for felony murder (count I), and the true findings in the murder special-circumstance allegations. Garcia and Segura aided and abetted in the commission of Tylor's and Brittany's attempted robberies. In addition, they were major participants who acted with reckless indifference to human life.

Appellants approached Tylor and Brittany together. Substantial evidence establishes that it was Koplen who asked for a cigarette, and it was Koplen who punched Tylor from behind. [Fn.15] Tylor ran away, telling them to leave Brittany alone. Garcia and Segura chased him, and one yelled they were going to cut off Tylor's "dick." After they ran, Koplen threatened Brittany with a knife and demanded her property. [Fn.16] Koplen then ran after Tylor, and, a short time later, Brittany heard Tylor screaming in pain. Shortly thereafter, appellants returned as a group to further intimidate her before fleeing when a resident opened her door.

> [Fn.15] In his opening brief, Koplen argues Brittany's assailant was really Segura, but he concedes that, based on substantial evidence, it appears he was the one who threatened Brittany with a knife. During closing arguments, the prosecutor asserted it was Koplen who threatened Brittany with a knife, and it was Koplen who stabbed Tylor. In their opening briefs, Garcia and Segura contend it was Koplen who threatened Brittany with the knife, claiming they were the ones who chased Tylor into the park.

> [Fn.16] The evidence strongly suggests Koplen used Alex's knife when he demanded property from Brittany. Although Brittany was never asked to identify the knife used in her attempted robbery, she said it had a black handle. Alex's knife also had a black handle.

The jury was entitled to draw reasonable inferences based on the circumstantial evidence (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166, 140 Cal.Rptr.3d 139, 274 P.3d 1132) and we must presume every inference in support of the judgment the finder of fact could reasonably have made. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293, 106 Cal.Rptr.3d 459, 226 P.3d 949.) Appellants' initial joint approach strongly implied prior planning and a clear suggestion that all three held an intent to participate in the subsequent crimes. It is reasonable to infer that Koplen's punch put into motion appellants' plan to rob Tylor and Brittany. Garcia's and Segura's chase of Tylor further strongly suggested their intent to participate in the attempted robberies. Garcia and Segura sought to capture and control Tylor, which further showed group planning and an intent to rob.

The circumstantial evidence clearly suggests that Garcia and Segura were able to catch Tylor and restrain him. After Koplen left Brittany to chase Tylor, she heard

Tylor screaming in pain. Shortly thereafter, appellants returned as a group to further intimidate her. Garcia had Tylor's blood on his shoe. Appellants' joint return after Tylor's screaming convincingly establishes that they were all together when Tylor was fatally injured. Their continued efforts to threaten Brittany as a group conclusively establishes a joint plan, an ongoing attempted robbery, and an effort to intimidate a witness to effectuate an escape. Appellants' coordinated actions, both before Tylor's stabbing and immediately after, overwhelmingly demonstrate Garcia's and Segura's intent to aid and abet in the attempted robberies.

The evidence further strongly demonstrates that Garcia and Segura were major participants in these underlying felonies, and they acted with reckless disregard for human life. They had an immediate and crucial role in Tylor's death. Tylor was unarmed, and he never threatened appellants. However, Garcia or Segura threatened to cut him. Based on that threat and their joint chasing of him, the evidence definitively establishes Garcia's and Segura's intent to either injure Tylor or to assist in harming him. This also creates an overwhelming inference they knew Koplen was armed with a knife and they had agreed to use a knife when confronting Tylor and Brittany. [Fn.17]

> [Fn.17] *Banks* makes clear a mere awareness a confederate is armed is insufficient to establish the requisite "reckless indifference to human life." (*Banks, supra*, 61 Cal.4th at p. 809, 189 Cal.Rptr.3d 208, 351 P.3d 330.) Further, *Banks* makes clear armed robbery, by itself, does not qualify as a felony for which "any major participation" would necessarily exhibit reckless indifference to human life. (*Id*. at p. 810, 189 Cal.Rptr.3d 208, 351 P.3d 330, fn. 9.)

At no time did either Garcia or Segura take any action to minimize the risk of violence during this incident. To the contrary, by chasing and threatening to cut Tylor, they both escalated the risk of a fatal injury. Their actions led to Tylor's stabbing. As the prosecutor asserted during closing argument, had Garcia and Segura not chased Tylor, this murder may have never occurred.

The evidence overwhelmingly suggests that Garcia and Segura were present at the scene of the killing, and in a position to both facilitate or prevent the actual murder. Based on Tylor's yelling, the nature of his wounds, and the amount of his bleeding, it is reasonable to infer that each appellant was aware of Tylor's distress and injuries. Appellants, however, did not render aid to Tylor. They did not call authorities to assist him. Instead, they abandoned Tylor and returned as a group to confront and harass Brittany.

When weighed together, the Supreme Court's factors establish that Garcia and Segura had a substantial role in the underlying attempted robberies leading to Tylor's murder. (See *Clark, supra*, 63 Cal.4th at p. 611, 203 Cal.Rptr.3d 407, 372 P.3d 811; *Banks, supra*, 61 Cal.4th at p. 803, 189 Cal.Rptr.3d 208, 351 P.3d 330.) Their personal involvement was greater than the actions of an ordinary aider and abettor to an ordinary felony murder. (See *Banks, supra*, 61 Cal.4th at p. 802, 189 Cal.Rptr.3d 208, 351 P.3d 330.) Garcia and Segura acted with reckless indifference to human life. (See *Clark, supra*, 63 Cal.4th at pp. 618–623, 203 Cal.Rptr.3d 407, 372 P.3d 811.) The evidence abundantly establishes that they held an awareness their participation in the attempted robberies involved a grave risk of death (see *Banks, supra*, 61 Cal.4th at p. 807, 189 Cal.Rptr.3d 208, 351 P.3d 330) and they had conscious disregard of an unjustifiable risk of death. (See *Clark, supra*, 63 Cal.4th at p. 617, 203 Cal.Rptr.3d 407, 372 P.3d 811.) They showed a "'gross deviation'" from the standard of conduct a law-abiding person would observe in this situation.

(*Ibid.*)

As in *Tison*, Garcia's and Segura's proximity to the murder and the events leading up to it was significant. They did far more than merely participate in an attempted robbery. They did not passively watch events unfold but were "actively involved in every element" of the attempted robberies. Their high level of participation in these crimes implicated them in Tylor's death. (*Tison, supra*, 481 U.S. at pp. 157–158, 107 S.Ct. 1676.) Like *Tison*, Tylor's murder was the culmination or foreseeable result of several intermediate steps, all of which involved Garcia and Segura. (See, e.g., *Clark, supra*, 63 Cal.4th at p. 619, 203 Cal.Rptr.3d 407, 372 P.3d 811 [providing this summary of *Tison*].) Similar to *Tison*, neither Garcia nor Segura made any effort to help Tylor. (*Tison, supra*, 481 U.S. at p. 141, 107 S.Ct. 1676.)

Unlike in *Enmund*, Garcia's and Segura's actions demonstrate their intent either a killing would take place or lethal force would be used. (*Enmund, supra*, 458 U.S. at p. 797, 102 S.Ct. 3368.) Unlike in *Banks*, Garcia and Segura were at the scene of the killing, they had an immediate role in the stabbing, they either saw and/or heard the fatal stabbing, and they made no effort to prevent the stabbing or assist Tylor. (*Banks, supra*, 61 Cal.4th at p. 805, 189 Cal.Rptr.3d 208, 351 P.3d 330.) On the *Enmund-Tison* spectrum, their conduct was much closer to *Tison* and nothing like *Enmund*. Garcia and Segura acted as major participants and with reckless indifference to human life.

Appellants contend inferences can be drawn from the circumstantial evidence that are favorable for them. For instance, Garcia argues it is possible the place where Tylor was found "was not necessarily the place where the stabbing occurred." He also asserts he must not have walked through the "large pool of blood" the officers observed because Tylor's blood stains on his (Garcia's) shoe were light. He contends nothing establishes he was aware Tylor had suffered "grave injuries." He states it is possible he exited the park without knowing Tylor had been fatally stabbed. These arguments are unpersuasive.

When considering a challenge to the sufficiency of the evidence to support a conviction, we do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy, supra*, 48 Cal.4th at p. 293, 106 Cal.Rptr.3d 459, 226 P.3d 949.) The circumstantial evidence in this matter overwhelmingly demonstrated that Garcia and Segura acted with knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose of committing, facilitating or encouraging commission of attempted robbery. (See *People v. McCoy, supra*, 25 Cal.4th at p. 1118, 108 Cal.Rptr.2d 188, 24 P.3d 1210.) The circumstantial evidence also established that Garcia and Segura acted as major participants and with reckless indifference to human life. (See *Banks, supra*, 61 Cal.4th at pp. 802, 807, 189 Cal.Rptr.3d 208, 351 P.3d 330.) As such, we will not reverse the felony-murder convictions or the true findings because the circumstances reasonably justify the jury's conclusions. (See *Ghobrial, supra*, 5 Cal.5th at p. 278.)

Finally, we need not address appellants' assertions that insufficient evidence linked Alex's robbery (count II) to Tylor's murder (count I). Likewise, we need not address respondent's contention that Tylor's and Brittany's attempted robberies (counts III and IV, respectively) as well as Alex's robbery (count II) may all qualify as the underlying felonies supporting felony murder. To the contrary, this record overwhelmingly establishes that the jury based the felony-murder convictions on the attempted robbery of Tylor or Brittany and not on Alex's robbery. The jury did not rely on a legally or factually unsupported theory of liability for felony murder. As

such, we reject Segura's claim the felony-murder convictions are based on a factually insufficient theory, requiring reversal under *People v. Guiton* (1993) 4 Cal.4th 1116, 17 Cal.Rptr.2d 365, 847 P.2d 45 and related authorities.

Based on this record, a reasonable trier of fact could find Garcia and Segura guilty beyond a reasonable doubt of felony murder. The circumstantial evidence overwhelmingly establishes they aided and abetted in the attempted robberies. Further, a reasonable jury could have found beyond a reasonable doubt Garcia's and Segura's personal involvement in the attempted robberies was "substantial" and "greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Banks, supra*, 61 Cal.4th at p. 802, 189 Cal.Rptr.3d 208, 351 P.3d 330.) Likewise, a reasonable jury could have found beyond a reasonable doubt Garcia and Segura acted with reckless indifference to human life and they were aware their participation in the felony involved a grave risk of death. (*Id*. at p. 807, 189 Cal.Rptr.3d 208, 351 P.3d 330.) The evidence supporting the jury's felony-murder convictions and true findings was reasonable, credible and of solid value. (See *Ghobrial, supra*, 5 Cal.5th at p. 277.) As such, substantial evidence supports the convictions in count I and the special circumstance allegations under section 190.2, subdivision (a)(17)(A). Accordingly, reversal of these convictions and true findings is not required, and these claims fail.

Koplen, 2019 WL 2647356, at *5–12.

        a.     Legal Standard and Analysis

As with the previous claim, Petitioner must demonstrate that the state court determination was an unreasonable application of the Jackson standard: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. Only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

Petitioner contends that insufficient evidence supported the convictions for first degree felony murder and the jury's special circumstance true findings under Cal. Penal Code § 190.2(a)(17)(A). As set forth above, the appellate court delineated the requirements for a conviction of felony murder and for a true finding on the special circumstance allegation. The appellate court concluded that there was substantial evidence supporting the verdicts that Petitioner aided and abetted in the attempted robbery, and that he was a major participant who acted with reckless indifference to human life.

First, the court noted that the three accomplices approached Tylor and Brittany together.

One of the attackers, likely Koplen, began the engagement by asking Tylor for a cigarette. Then, Koplen struck Tylor from behind. Tylor fled into the park, and Petitioner and Garcia chased after him. These actions provided evidence of planning and joint participation. The fact that Petitioner and Garcia chased Tylor into the park shows they intended to participate in the attempted robberies. Petitioner and Garcia attempted to capture and control Tylor, which further demonstrates intent to participate and rob. Koplen then left Brittany and ran into the park. Shortly thereafter, she heard Tylor scream in pain. The three accomplices then returned and approached Brittany. Garcia had Tylor's blood on his shoe. The state court reasonably determined that the accomplices' actions in pursuing Tylor together, then returning together to confront and intimidate Brittany, established a joint plan, an ongoing attempted robbery, and an effort to intimidate a witness to effectuate an escape.

The appellate court also reasonably found that sufficient evidence supported the special circumstance finding, specifically, that Petitioner was a "major participant" and acted with "reckless disregard for human life." As noted by the state court, Petitioner and Garcia pursued Tylor and were threatening to cut him even though Tylor was unarmed and attempting to flee. This was ample evidence to support a finding that Petitioner intended to either injure Tylor or assist in injuring him. This was also evidence from which a jury could conclude that they knew Koplen was armed with a knife and intended to use it. The court further pointed out that Petitioner and Garcia's involvement was so integral, that the murder may never have occurred if not for Petitioner's and Garcia's actions in pursuing and capturing Tylor. The court also noted that all three accomplices returned together, and neither one attempted to render aid to Tylor despite his severe injury and his screams of pain. In light of the evidence, the state court reasonably determined that Petitioner was a major participant, and that he acted with reckless disregard for human life.

Petitioner contends that the inconsistent verdicts in the case render the verdicts infirm. As pointed out by Respondent, the Supreme Court has stated that "[s]ufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. . . . This review should be

*independent* of the jury's determination that evidence on *another* count was insufficient." <u>United States v. Powell</u>, 469 U.S. 57, 67 (1984) (emphasis added). "The Supreme Court has made it clear that inconsistent verdicts may stand when one of those verdicts is a conviction and the other an acquittal." <u>Ferrizz v. Giurbino</u>, 432 F.3d 990, 992-93 (9th Cir. 2005). As previously discussed, Petitioner fails to demonstrate that there was insufficient evidence supporting the felony murder conviction and the special circumstance allegation. The inconsistent verdicts do not call into question the state court's determination. The claims should be denied.

      3.     <u>Instructional Error – Murder Special Circumstance</u>

Petitioner next claims the trial court erred in instructing the jury on the murder special circumstance. Petitioner also raised this claim on direct review in the state courts. The Fifth DCA denied the claim as follows:

**X. Reversal Is Not Required For Alleged Instructional Errors.**

Appellants raise three separate claims of instructional error. First, they argue instructional error occurred regarding the murder special-circumstance allegations. Second, Garcia and Segura contend instructional error occurred regarding voluntary intoxication. Finally, appellants claim error occurred regarding how the jury was instructed on aiding and abetting during Alex's robbery (count II).

Instructional errors are questions of law, which we review de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569–570, 76 Cal.Rptr.2d 239, 957 P.2d 928.) We must ascertain the relevant law and determine whether the given instruction correctly stated it. (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526, 3 Cal.Rptr.2d 677, 822 P.2d 385.) We address the three claims.

    **A.   The instruction regarding the murder special-circumstance allegations.**

According to section 190.2, subdivision (d), a sentence of death or LWOP is required for a nonkiller who, "with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission" of certain enumerated felonies which results in the death of a person.

Tracking the form language of CALCRIM No. 703, the trial court instructed the jury on the elements necessary to find true the felony-murder special-circumstance allegations. For a defendant who was not the actual killer but who aided and abetted murder, the prosecution had to prove either the defendant intended to kill or each of the following occurred: (1) the defendant's participation in the crime began before or during the killing; (2) the defendant was a major participant in the crime; and (3) when the defendant participated in the crime, he acted with reckless indifference to human life.

Appellants argue instructional error occurred. They assert section 190.2, subdivision

25

(d), requires a finding *a defendant's participation* in the underlying felony *caused* the victim's death. They rely on *Banks, supra*, 61 Cal.4th 788, 189 Cal.Rptr.3d 208, 351 P.3d 330 for this interpretation. Focusing on the possibility the jury *may* have based its felony-murder convictions on Alex's robbery, appellants contend the instruction given under CALCRIM No. 703 was prejudicial. They maintain the jury was permitted to misapply the escape rule (CALCRIM No. 3261) and find them liable for Tylor's murder without finding their participation in Alex's robbery caused Tylor's death.

Appellants' numerous arguments are unpersuasive. [Fn.30] We reject their interpretation of section 190.2, subdivision (d), and we do not find instructional error. Further, even if error occurred, any presumed error was harmless.

> [Fn.30] Respondent contends forfeiture occurred because appellants did not seek clarification or amplification of the CALCRIM No. 703 instruction. Appellants dispute forfeiture. We need not address forfeiture because this claim fails on its merits and any presumed error was harmless.

### 1. Instructional error did not occur.

"When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1229, 144 Cal.Rptr.3d 716, 281 P.3d 799.) The issue is whether it is reasonably likely the jurors understood the instruction in the manner appellants now assert. (*People v. Cross* (2008) 45 Cal.4th 58, 67–68, 82 Cal.Rptr.3d 373, 190 P.3d 706.) We must consider several factors, including the language of the disputed instruction, the trial record, and the arguments of counsel. (*People v. Nem* (2003) 114 Cal.App.4th 160, 165, 7 Cal.Rptr.3d 478.)

As an initial matter, we reject appellants' contentions that section 190.2, subdivision (d), requires a nonkiller's participation in an underlying felony to cause the victim's death. To the contrary, *Banks* makes clear a nonkiller "must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks, supra*, 61 Cal.4th at p. 801, 189 Cal.Rptr.3d 208, 351 P.3d 330.) *Banks* does not support appellants' statutory interpretation. Instead, it is major participation in the committed felony, combined with reckless indifference to human life, which satisfies the constitutional requirement and the language of section 190.2, subdivision (d). (*Banks, supra*, 61 Cal.4th at p. 804, 189 Cal.Rptr.3d 208, 351 P.3d 330.)

This record establishes no instructional error. The jury was correctly informed a defendant is liable for felony murder if he intended to commit robbery (or its attempt) and he caused the death of a person while committing robbery (or its attempt). The jurors were instructed about the general requirements of liability for aiding and abetting. They were instructed an accomplice could be liable for felony murder if the defendant intended to aid a perpetrator in robbery (or its attempt), the defendant provided such aid, and, during the robbery (or its attempt), the perpetrator caused the death of another person. With CALCRIM No. 703, the jurors learned the special circumstance allegations applied for a nonkiller who participated in the crime before or during the killing, and who acted as a major participant and with reckless indifference to human life.

During closing argument, the prosecutor repeatedly asserted that felony-murder liability was based on the attempted robberies of Tylor and Brittany. The prosecutor emphasized the special circumstance allegations under section 190.2 applied because Tylor's murder occurred during an attempted robbery (counts III and IV). At no time did the prosecutor argue felony murder or the special circumstance allegations were based on Alex's robbery (count II).

Based on the court's instructions and the prosecutor's arguments, no reasonable likelihood exists that the jury applied CALCRIM No. 703 in an impermissible manner. (See *People v. Houston, supra*, 54 Cal.4th at p. 1229, 144 Cal.Rptr.3d 716, 281 P.3d 799.) To the contrary, the jurors were instructed a nonkiller must act with reckless indifference to human life and as a major participant during an attempted robbery which resulted in the death of a person. It is not reasonably likely the jurors understood the instruction in the manner appellants now suggest. (See *People v. Cross, supra*, 45 Cal.4th at pp. 67–68, 82 Cal.Rptr.3d 373, 190 P.3d 706.) The jury was properly instructed on the requirements of section 190.2, subdivision (d). As such, instructional error did not occur, and this claim fails. In any event, even if error occurred, any presumed error was harmless.

### 2. Any presumed instructional error was harmless.

Garcia and Segura argue the murder special-circumstance instruction given under CALCRIM No. 703 was prejudicial under *Chapman*. They contend this instruction did not require the jury to find Tylor's death resulted from their participation in Alex's robbery (count II). These contentions are meritless.

The jury based the murder special-circumstance allegations on the attempted robbery of Tylor or Brittany (counts III and IV, respectively). As such, we reject Segura's assertion the jury received a "'legally inadequate'" theory, requiring reversal of the murder special-circumstance findings under *People v. Guiton, supra*, 4 Cal.4th 1116, 17 Cal.Rptr.2d 365, 847 P.2d 45. The jury did not rely on a legally or factually unsupported theory of liability either for Tylor's felony murder or for the special circumstance findings. It is beyond any reasonable doubt that Garcia and Segura acted with "reckless indifference to human life and [were] major participant[s]" while aiding and abetting in the attempted robberies of Tylor and Brittany. Thus, even if instructional error occurred under CALCRIM No. 703, any presumed error was harmless. Accordingly, prejudice is not present, and this claim fails.

Koplen, 2019 WL 2647356, at *36-38.

#### a.    Legal Standard

As an initial matter, the Court notes that a claim that a jury instruction violated state law is not cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  Id. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable,

erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law). Moreover, the petitioner's "burden is especially heavy [where] no erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155.

A habeas petitioner is also not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47 (1998).

b.      Analysis

The state court determined that the special circumstance instruction given to the jury comported with California law. Petitioner contends that the state court's reasoning was erroneous. Federal habeas relief is unavailable for Petitioner's claim because a federal court is bound by the state court's determination of state law. Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam).

Moreover, the state court reasonably found that any possible error was harmless. Petitioner contends that the jury was not instructed that it needed to find that the victim's death resulted from his participation in Alex's robbery. Petitioner's argument is meritless, for as the

28

state court repeatedly stated, the jury based the murder special circumstance allegation on the attempted robbery of Tylor or Brittany. This was evident in the instructions given and in the prosecutor's closing arguments. Thus, the state court reasonably found that any possible error in the instructions given were harmless. The claim should be rejected.

> 4.     Instructional Error – Defense Instructions

Petitioner contends that the trial court erred by declining the defense's request to instruct the jury on the "escape rule," "continuous transaction rule," and the requirement of a "logical connection" between the underlying felony and the homicide. Petitioner raised this claim on direct review, and it was denied by the Fifth DCA as follows:

> **IV. The Trial Court Did Not Err In Failing To Provide Additional Felony-Murder Instructions And Any Presumed Error Is Harmless.**
>
> Appellants raise two separate but related claims of instructional error regarding felony murder. They assert the trial court prejudicially failed to instruct on both the "continuous transaction" doctrine and the requirement for a "logical connection" between the underlying felony and the killing. They seek reversal of their respective murder convictions in count I, along with the true findings for the special circumstance allegations.
>
> **A. Background.**
>
> This dispute centers around two instructions, former CALCRIM No. 549 and an optional instruction appearing in the bench notes of CALCRIM No. 540A.
>
> **1. The relevant instructions.**
>
> Former CALCRIM No. 549 was created in 2006. In relevant part, this former instruction stated a defendant is guilty of felony murder when the underlying felony and the act causing the death "'were part of one continuous transaction.'" (Revoked CALCRIM No. 549, as quoted in *People v. Wilkins* (2013) 56 Cal.4th 333, 349, 153 Cal.Rptr.3d 519, 295 P.3d 903 (*Wilkins*).) This instruction provided factors to consider, such as when and where the fatal act and the underlying felony occurred. (*Wilkins, supra,* 56 Cal.4th at p. 349, 153 Cal.Rptr.3d 519, 295 P.3d 903.) However, in 2013 and before this matter went to trial, the CALCRIM committee revoked former CALCRIM No. 549 and it placed an optional instruction in the bench notes of CALCRIM No. 540A. The optional instruction states:
>
> > "There is no sua sponte duty to clarify the logical nexus between the felony and the homicidal act. If an issue about the logical nexus requirement arises, the court may give the following language: [¶] There must be a logical connection between the cause of death and the [underlying felony]. The connection between the cause of death and the [underlying felony] must involve more than just their occurrence at the same time and place." (Judicial Council of Cal., Crim. Jury Instns. (2019) Bench Notes to CALCRIM No. 540A, vol. 1, pp. 263–264.)

In *Cavitt*, our high court noted only a "'few'" cases raise a genuine issue as to the existence of a logical nexus between the felony and the homicide. (*Cavitt, supra*, 33 Cal.4th at p. 204, fn. 5, 14 Cal.Rptr.3d 281, 91 P.3d 222.) The *Cavitt* court provided an example of when a logical nexus would not exist: a burglar who happens to spy a lifelong enemy through the window of the victim's house and fires a fatal shot may have committed a killing while a robbery and burglary were taking place, but the killing did not occur "in the commission" of those crimes. (*Id.* at p. 203, 14 Cal.Rptr.3d 281, 91 P.3d 222.)

### 2. The jury instruction conference in this matter.

At the jury instruction conference in this matter, Koplen's trial counsel objected to instruction on the "escape rule" [Fn.19] in the context of attempted robbery of Tylor and Brittany. Koplen's counsel requested jury instruction on the requirement of a "logical connection" between the underlying felony and the killing. According to Koplen's counsel, it was possible the jury could believe Tylor's murder was not connected with an attempted robbery. The trial court declined to deviate from the standard instructions.

> [Fn.19] CALCRIM No. 3261 sets forth the escape rule. In relevant part, a robbery or attempted robbery "continues until the perpetrator[s] (has/have) actually reached a place of temporary safety." This instruction provides a jury with examples of reaching such safety, such as when (1) a perpetrator has "successfully escaped from the scene;" (2) is "no longer being chased;" (3) has "unchallenged possession" of the property; and (4) is "no longer in continuous physical control of the person who was the target of the robbery."

During the jury conference, the parties discussed the logical nexus instruction and the escape rule in the context of attempted robbery involving Tylor and Brittany. At no point during this discussion did the prosecutor suggest the alleged felony murder was based on Alex's robbery. In fact, Koplen's trial counsel acknowledged that felony-murder liability in this matter was based on the attempted robbery of Tylor or Brittany.

### B. Standard of review.

If requested, a trial court should give a legally correct instruction if it is supported by substantial evidence. (*Wilkins, supra*, 56 Cal.4th at p. 347, 153 Cal.Rptr.3d 519, 295 P.3d 903.) In criminal cases, a court must instruct on the general principles of law relevant to the issues raised by the evidence even in the absence of a request. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189, 185 Cal.Rptr.3d 431, 345 P.3d 62.) These are the principles "'closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations.]" (*Ibid.*) We review de novo a claim a trial court failed to give a required jury instruction. (*People v. Waidla* (2000) 22 Cal.4th 690, 733, 94 Cal.Rptr.2d 396, 996 P.2d 46.)

### C. Analysis.

Appellants claim the trial court erred when it failed to provide the requested optional instruction appearing in the bench notes of CALCRIM No. 540A. Garcia and Segura further assert the court should have instructed the jury with former CALCRIM No. 549 on the "continuous transaction" doctrine. They contend the jurors received a "misleading impression" a continuous transaction was not necessary so long as Tylor's killing occurred before they reached a place of temporary safety.

Koplen acknowledges CALCRIM No. 549 was revoked prior to trial. He contends, however, the CALCRIM committee deleted an "essential element" necessary to find felony-murder liability. He argues the "one continuous transaction" is an "authoritative interpretation" of the statutory requirements for felony murder, which should have been given to the jury. [Fn.20] He claims a failure to instruct on a "causal relationship" made a "major difference" in this case. He also asserts error occurred because the court instructed on the escape rule without instruction on the "continuous transaction" doctrine.

> [Fn.20] Our Supreme Court has long recognized the "continuous transaction" doctrine. (See, e.g., *People v. Chavez* (1951) 37 Cal.2d 656, 670, 234 P.2d 632.) Generally, felony murder "does not require proof of a strict causal or temporal relationship between the felony and the killing. [Citation.] Rather, a killing has been 'committed in the perpetration of' the underlying felony within the meaning of section 189 'if the killing and the felony are parts of one continuous transaction.' [Citations.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 61–62, 219 Cal.Rptr.3d 331, 396 P.3d 480.)

We find appellants' numerous assertions unpersuasive. The court did not err in failing to provide additional instruction. In any event, even if instructional error occurred, any presumed error was harmless.

### 1. Instructional error did not occur.

Our high court has noted only a few cases raise a genuine issue as to the existence of a logical nexus between the underlying felony and the homicide. (*Cavitt, supra*, 33 Cal.4th at p. 204, fn. 5, 14 Cal.Rptr.3d 281, 91 P.3d 222.) The facts surrounding Tylor's murder, however, did not present such an issue. The homicidal act causing Tylor's death was not like the hypothetical burglar in *Cavitt* who happens to spy a lifelong enemy through the window of the house and fires a fatal shot. (*Id.* at p. 200, 14 Cal.Rptr.3d 281, 91 P.3d 222.) To the contrary, this homicide was not a mere coincidence of time and place, and this murder was not independent of Tylor's or Brittany's attempted robberies.

The jury received proper instruction on the necessary elements for felony murder. The jury was informed that Tylor's homicide had to occur during the commission of a robbery or attempted robbery. (§ 189, subd. (a).) According to the prosecutor, this killing occurred during the attempted robbery of Tylor or Brittany. The evidence conclusively established that Tylor's death was logically connected with these charged crimes. Thus, the trial court was not required to provide additional felony-murder instruction. (See *Wilkins, supra*, 56 Cal.4th at p. 347, 153 Cal.Rptr.3d 519, 295 P.3d 903; *Cavitt, supra*, 33 Cal.4th at p. 203, 14 Cal.Rptr.3d 281, 91 P.3d 222.)

We reject Segura's assertion the jury received a "legally erroneous" theory of guilt regarding felony murder, requiring reversal. Based on the special circumstance allegations and the evidence, we can declare beyond a reasonable doubt the jury based its felony-murder convictions on a legally and factually valid theory. (See, e.g., *People v. Chun* (2009) 45 Cal.4th 1172, 1204–1205, 91 Cal.Rptr.3d 106, 203 P.3d 425 [applying J. Scalia's test to look at "other aspects of the verdict or the evidence" to resolve a claim involving instructional error for felony murder].) The jury was not misled regarding the proper application of felony murder in this matter.

Appellants cite *People v. Sakarias* (2000) 22 Cal.4th 596, 94 Cal.Rptr.2d 17, 995 P.2d 152 (*Sakarias*) for the general proposition a "continuous transaction" can end before a perpetrator reaches a place of temporary safety. They argue a jury must

always receive instruction on the "continuous transaction" doctrine and the trial court improperly removed that issue from the jury's consideration. These arguments are without merit.

In *Sakarias*, two burglars entered a residence and gathered property. They assaulted and killed the homeowner when she entered the residence. (*Sakarias, supra*, 22 Cal.4th at p. 626, 94 Cal.Rptr.2d 17, 995 P.2d 152.) During deliberations, the jury asked the trial court whether a burglary continues until the burglars leave the structure. Over a defense objection, the court informed the jurors that the homicide and the burglary were part of one continuous transaction if they determined burglary had occurred. (*Id*. at p. 623, 94 Cal.Rptr.2d 17, 995 P.2d 152.) The Supreme Court found error because the trial court had "relieved the jury of its obligation to determine whether all the elements of first degree murder and the burglary-murder special circumstance were proven beyond a reasonable doubt." (Id. at pp. 624–625, 94 Cal.Rptr.2d 17, 995 P.2d 152.)

The *Sakarias* court, however, found the error harmless. It noted in some circumstances a burglary can end even if the perpetrator has not left the structure. For example, the perpetrator "abandons his original larcenous intent but resolves to stay for a nonfelonious purpose." (*Sakarias, supra*, 22 Cal.4th at p. 625, 94 Cal.Rptr.2d 17, 995 P.2d 152.) The evidence in *Sakarias*, however, did not establish any "abandonment of intent or any similar interruption." (*Ibid*.) The judgment was affirmed. (*Id*. at p. 650, 94 Cal.Rptr.2d 17, 995 P.2d 152.)

*Sakarias* does not establish instructional error in the present matter. Unlike in *Sakarias*, the trial court did not remove an issue from the jury's consideration. (*Sakarias, supra*, 22 Cal.4th at p. 624, 94 Cal.Rptr.2d 17, 995 P.2d 152.) To the contrary, the court informed the jurors that appellants were charged with the special circumstance of murder committed "*while engaged*" in the commission of robbery or its attempt. (Italics added.) The prosecutor asserted felony murder occurred during, and only during, the attempted robbery of Tylor or Brittany. Based on the jury's true findings, it is apparent the jury decided beyond a reasonable doubt that Tylor's homicide was logically connected with his or Brittany's attempted robbery. *Sakarias* is distinguishable and does not mandate reversal of this matter.

Finally, Koplen contends the CALCRIM committee deleted an "essential element" necessary to find felony-murder liability. He notes the Supreme Court has called the "continuous transaction" doctrine an "element" of felony murder. (*Wilkins, supra*, 56 Cal.4th at p. 349, 153 Cal.Rptr.3d 519, 295 P.3d 903.) We find no error in the CALCRIM instructions.

The CALCRIM instructions make it clear a homicide must occur in the commission of an underlying felony. (See CALCRIM Nos. 540A and 540B.) Based on the optional instruction appearing in CALCRIM No. 540A, "[i]f an issue about the logical nexus requirement arises," a trial court may instruct on the need for a logical connection between the cause of death and the underlying felony. (Bench notes to CALCRIM No. 540A, *supra*, at pp. 263–264.) As our Supreme Court makes abundantly clear, however, it is rare when a logical nexus does not exist between the felony and the homicide. (*Cavitt, supra*, 33 Cal.4th at p. 204, fn. 5, 14 Cal.Rptr.3d 281, 91 P.3d 222.) We discern no error in the current wording of the CALCRIM instructions regarding felony-murder liability.

Based on this record, the jury received the necessary and proper instructions to determine whether Tylor's homicide was "committed in the perpetration of, or attempt to perpetrate," the underlying felony. (§ 189, subd. (a).) The jury was also

properly instructed on the elements necessary to find true the murder special-circumstance allegations (§ 190.2, subd. (a)(17)(A)). The trial court did not err in refusing to instruct the jury on the optional "logical connection" instruction appearing in the bench notes of CALCRIM No. 540A. The court also did not err in failing to provide instruction under former CALCRIM No. 549. These principles of law were neither supported by substantial evidence nor were they necessary for the jury's understanding of the case. (See *People v. Diaz, supra,* 60 Cal.4th at p. 1189, 185 Cal.Rptr.3d 431, 345 P.3d 62; *Wilkins, supra,* 56 Cal.4th at p. 347, 153 Cal.Rptr.3d 519, 295 P.3d 903; *Cavitt, supra,* 33 Cal.4th at p. 203, 14 Cal.Rptr.3d 281, 91 P.3d 222.) Accordingly, appellants' various arguments are without merit, and this claim fails. In any event, even if instructional error occurred, we also determine any presumed error was harmless.

### 2. Any presumed error was harmless.

Appellants contend the court's alleged instructional errors were prejudicial under *Chapman v. California* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (*Chapman*). Garcia and Segura argue it "appears" the jury based its first degree murder verdicts on a theory Alex's robbery (count II) was "continuing" when Tylor was murdered. They assert it is possible the jury would not have found the killing linked to Alex's robbery if additional instructions had been provided.

These arguments are meritless. This record clearly establishes that any presumed error was harmless.

A federal constitutional error is harmless under *Chapman, supra,* 386 U.S. 18, 87 S.Ct. 824, when the reviewing court determines beyond a reasonable doubt the error did not contribute to the verdict. (*People v. Aranda* (2012) 55 Cal.4th 342, 367, 145 Cal.Rptr.3d 855, 283 P.3d 632.) An error did not contribute to the verdict when the record reveals the error was unimportant in relation to everything else the jury considered on the issue in question. (*Yates v. Evatt* (1991) 500 U.S. 391, 403, 111 S.Ct. 1884, 114 L.Ed.2d 432, disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4, 112 S.Ct. 475, 116 L.Ed.2d 385.) The inquiry is whether the guilty verdict rendered in this trial was "surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182.)

We reject Garcia's and Segura's repeated assertions that prejudicial instructional error occurred because the jury may have based felony murder on Alex's robbery. To the contrary, it is beyond any reasonable doubt the jury based the felony-murder convictions on the attempted robbery of Tylor or Brittany (counts III and IV, respectively). Further, the evidence overwhelmingly established that appellants were jointly engaged at all times throughout the attempted robberies, and Tylor's killing was part of one continuous transaction during those underlying felonies. His murder was more than a mere coincidence of time and place. Instead, Tylor's death was related to the attempted robberies and a logical nexus existed. As such, the requisite temporal relationship existed between the underlying felony and this homicidal act. (*Cavitt, supra,* 33 Cal.4th at p. 196, 14 Cal.Rptr.3d 281, 91 P.3d 222.) Nothing suggests Tylor's death was the result of a homicidal act completely unrelated to attempted robbery. Thus, felony murder applied to any nonkiller in this matter. (*Ibid.*)

Based on this record, any presumed error by the trial court was harmless beyond a reasonable doubt. The court's alleged errors in failing to provide further instruction on felony murder were unimportant in relation to everything else the jury considered

regarding guilt. (See *Yates v. Evatt, supra*, 500 U.S. at p. 403, 111 S.Ct. 1884.) The verdicts rendered in this trial were surely unattributable to the claimed instructional omissions. (See *Sullivan v. Louisiana, supra*, 508 U.S. at p. 279, 113 S.Ct. 2078.) Accordingly, prejudice is not present, and this claim fails.

Koplen, 2019 WL 2647356, at *13–18.

### a.     Legal Standard

The same standard set forth in the previous claim of instructional error applies here.  To merit relief, Petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  Cupp, 414 U.S. at 147.  The instruction must be considered in the context of the instructions as a whole and the trial record, see Estelle, 502 U.S. at 72, and the petitioner's "burden is especially heavy [where, as here,] no erroneous instruction was given." Henderson, 431 U.S. at 155.  Further, Petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637.

### b.     Analysis

In rejecting Petitioner's claims, the state court determined that the instructions given were correct under state law.  Thus, Respondent is correct that Petitioner's challenge does not give rise to a federal question cognizable on federal habeas review.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

Further, the state court's rejection of the claim was not objectively unreasonable.  The state court reasonably determined that there was no instructional error.  Petitioner argued that the trial court failed to instruct on a logical nexus required between the underlying felony and the homicide.  However, the facts of the case did not present an issue concerning the connection between the robbery of Tylor and Brittany and the homicide of Tylor. The homicide was not independent of the robbery.  Moreover, the jury was instructed that to find Petitioner guilty of felony murder, it had to find that the murder occurred *during* the robbery or attempted robbery. Cal. Penal Code § 189(a) (emphasis added).  Likewise, the jury was informed that to find

1   Petitioner guilty of the special circumstance, it had to find that the murder was "committed '*while*

2   *engaged*' in the commission of robbery or its attempt." Koplen, 2019 WL 2647356, at *13–18.

3   The prosecutor argued only that the murder occurred during the robbery or attempted robbery of

4   Tylor or Brittany. Accordingly, the state court reasonably found that additional instruction on the

5   issue of "logical nexus" was unnecessary.

6        The state court also found that any possible error was not prejudicial. Petitioner fails to

7   demonstrate that this determination was objectively unreasonable. The court noted that it was

8   beyond any reasonable doubt that the jury based the felony murder convictions on the attempted

9   robbery of Tylor or Brittany. The murder and attempted robbery occurred during one continuous

10  transaction in which all perpetrators were actively involved. There was simply no evidence from

11  which to conclude that the homicide was a coincidence of time and place completely unrelated to

12  the attempted robbery. Thus, even if the jury had been given the instructions Petitioner requested,

13  the result would not have been different. Petitioner fails to show that no "fairminded jurist" could

14  agree with the state court's reasoning. The claim should be denied.

15       5.      Prosecutorial Misconduct – Misstatement of Law

16       Petitioner next claims that the prosecutor committed misconduct by misstating the law,

17  specifically, by referencing a "course of conduct" rather than "continuous transaction." (Doc. 1 at

18  54-56.) In the last reasoned state court decision, the Fifth DCA denied the claim as follows:

19       **VII. Prosecutorial Misconduct Did Not Occur.**

20       Appellants raise three separate claims of prosecutorial misconduct centered around
         closing argument. First, they contend the prosecutor misstated law. Second, Garcia
21       and Segura argue the prosecutor misled the jury regarding certain evidence. Finally,
         appellants claim the prosecutor improperly appealed to the jurors' emotions.
22

23       **A. Standard of review.**

24       A prosecutor's misconduct violates the federal Constitution and requires reversal
         when it infects the trial with such unfairness as to deny due process. (*People v. Tully*
25       (2012) 54 Cal.4th 952, 1009, 145 Cal.Rptr.3d 146, 282 P.3d 173.) Under state law,
         a prosecutor's conduct not rendering a criminal trial fundamentally unfair is still
26       misconduct if it involves the use of deceptive or reprehensible methods in attempting
         to persuade the trier of fact. (*Id*. at pp. 1009–1010, 145 Cal.Rptr.3d 146, 282 P.3d
         173.)
27  /////
    /////
28  /////

                                              35

## B. Analysis.

We analyze and reject each of appellants' three claims of misconduct.

### 1. The prosecutor's alleged misstatement of law.

During closing argument, the prosecutor used the term "course of conduct" when describing some of the criminal events. Appellants claim this was a misstatement of law.

### a. Background facts for this claim.

This issue started during the jury instruction conference when the prosecutor used the terms "course of conduct" and "single course of conduct" when describing felony murder. At that hearing, Koplen's trial counsel objected to the prosecutor's terminology, complaining the term "'continuous transaction'" applied to felony murder and the prosecutor's terms were incorrect. The trial court did not comment.

During her closing argument, the prosecutor used the term "course of conduct" on at least two occasions. First, when discussing the attempted robbery of Tylor and Brittany the following exchange occurred:

"[THE PROSECUTOR]: If you only find that Brittany was the victim of the attempted robbery and you find that it's one *course of conduct* and then [appellants] haven't reached a place of temporary safety—

"[COUNSEL FOR KOPLEN]: Object to 'course of conduct.' Misstating the law.

"THE COURT: It's overruled. [¶] Ladies and Gentlemen, words and phrases used during this trial that have legal meanings will be defined for you via instructions. Words not defined in the instructions are to be applied using their everyday, ordinary meanings. [¶] Go ahead, please.

"[THE PROSECUTOR]: Can I have my last comment read back, please. [¶] (Record read.) [¶] —and that Tylor is killed in the park during that *course of conduct* and they haven't reached a place of temporary safety, then it's felony murder. Tylor does not have to be the victim of the attempted robbery, but I would submit to you that he is the victim of his own attempted robbery." (Italics added.)

The prosecutor later discussed the escape rule. Regarding counts III and IV (attempted robbery of Tylor and Brittany, respectively), the prosecutor stated she had to prove "that a murder occurred while committing an attempted robbery." She then said the following:

"[THE PROSECUTOR]: The crime of robbery or attempted robbery continues until the perpetrators have actually reached a place of temporary safety. The perpetrators have reached a place of temporary safety if they have successfully escaped from the scene and they are no longer being chased, they have unchallenged possession of the property, and they are no longer in continuous control of the person who was the target of the robbery. They have not reached a place of temporary safety until they're caught, because they never leave the park.

"And the timing of the two incidents are so close in time—they're within six minutes of each other—that they have never reached a place of temporary safety because they're being chased—at least [Segura] is being chased down [by a police officer]. You remember that. We saw that video over and over again; right?

"So they're being chased, and we know that's after the 911 calls for both incidents because the first call comes in at 8:24, which is the incident involving [Alex]. Remember that? 8:24. And the second 911 call comes in [at 8:30]. That's six minutes apart. *It's one continuous course of conduct.* They have never left the park. They have just gone to a different area in the park, and they're engaged in criminal activity. They're still engaged in criminal activity. And from the first and second call to 911—even though they're different incidents—is when police are being dispatched ...." (Italics added.)

After the prosecutor concluded her argument, counsel for Koplen objected this was a misstatement of law because the term "continuous transaction" applied to felony murder while a "course of conduct" was something different. The trial court responded it had not prohibited this phrase. According to the court, the jurors would have "no reason to believe anything other than what the words dictate."

**b. The prosecutor did not misstate the law.**

Appellants claim that, following the trial court's alleged error in not instructing on the "continuous transaction" doctrine (former CALCRIM No. 549), the prosecutor's comments misled the jurors and misstated the law. They assert the jury could have erroneously believed Alex's robbery (count II) was a permissible basis for felony murder because it was still ongoing when Tylor was killed. We find no misconduct and reject this claim.

A prosecutor commits misconduct if he or she misstates the applicable law. (*People v. Boyette* (2002) 29 Cal.4th 381, 435, 127 Cal.Rptr.2d 544, 58 P.3d 391.) To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the disputed comments in an improper or erroneous manner. (*People v. Centeno* (2014) 60 Cal.4th 659, 667, 180 Cal.Rptr.3d 649, 338 P.3d 938 (*Centeno*).) In making this showing, the defendant should examine the prosecutor's entire argument and the jury instructions. (*Ibid.*)

Here, the prosecutor's initial remarks were clearly about the attempted robbery of Tylor and Brittany. The prosecutor explained felony murder occurred because Tylor was killed before Brittany's attempted robbery ended. The second disputed remark occurred when the prosecutor discussed the escape rule. The prosecutor reminded the jury she had to prove murder occurred while appellants were committing an attempted robbery.

The prosecutor did not use the phrases "course of conduct" or "continuous course of conduct" to link Alex's robbery (count II) to felony murder. Instead, she emphasized appellants never reached a place of temporary safety. As asserted by the prosecutor, although the two crimes were different incidents, appellants never left the park. The prosecutor did not misstate the law. [Fn.25]

[Fn.25] Because the prosecutor did not commit misconduct, we also reject appellants' assertions the trial court "improperly endorsed" the prosecutor's

alleged misstatement of the law.

In a footnote in his opening brief, Garcia concedes it appears the prosecutor did not use the escape rule as a basis for felony murder. He argues, however, the prosecutor's comments were confusing. In his reply brief, Garcia asserts the prosecutor's erroneous terminology ("course of conduct") coupled with the escape rule misled jurors to believe they could rely on Alex's robbery to support felony murder. We disagree.

The prosecutor made it abundantly clear felony murder was based on the attempted robberies of Tylor or Brittany. It is not remotely possible a reasonable juror would have believed the felony murder charge was linked to Alex's robbery (count II) or the prosecutor was making such an argument. It is not reasonably likely the jury understood or applied the disputed comments in an improper or erroneous manner. (See *Centeno, supra*, 60 Cal.4th at p. 667, 180 Cal.Rptr.3d 649, 338 P.3d 938.)

Based on this record, prosecutorial misconduct did not occur. The prosecutor did not misstate the law. In any event, appellants have not shown a reasonable likelihood the jury understood or applied the disputed comments in an improper or erroneous manner. (See *Centeno, supra*, 60 Cal.4th at p. 667, 180 Cal.Rptr.3d 649, 338 P.3d 938.) Accordingly, appellants' arguments are without merit, and this claim fails.

Koplen, 2019 WL 2647356, at *21–24.

      a.     Legal Standard

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667 (1985)). Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994). The Court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982). If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 (Only if constitutional error is established "would we have to decide whether the constitutional error was harmless.").

38

b.    Analysis

Petitioner contends the prosecutor committed misconduct by using the terms "course of conduct" rather than "continuous transaction" when describing felony murder. In rejecting the claim, the state court reasonably determined that the prosecutor did not misstate the law. The state court noted that the prosecutor did not use the terminology to describe felony murder. In the first instance, the prosecutor used "course of conduct" when discussing the facts of the attempted robbery of Tylor and Brittany, not felony murder. In the second instance, the prosecutor used the terminology in discussing the escape rule. The state court noted that the prosecutor never used the terms to link Alex's robbery to felony murder. The court reasonably determined that the jury applied the terms in a legally correct manner.

6.    Instructional Error – Aiding and Abetting

Petitioner next alleges the trial court erred in instructing the jury with CALCRIM No. 1603, which articulated the "getaway driver" theory of robbery, by erroneously eliminating the *actus reus* requirement for derivative liability as an aider and abettor of robbery. (Doc. 1 at 56-59.) Petitioner raised this claim on direct review, and it was denied by the appellate court as follows:

**X. Reversal Is Not Required For Alleged Instructional Errors.**

Appellants raise three separate claims of instructional error. First, they argue instructional error occurred regarding the murder special-circumstance allegations. Second, Garcia and Segura contend instructional error occurred regarding voluntary intoxication. Finally, appellants claim error occurred regarding how the jury was instructed on aiding and abetting during Alex's robbery (count II).

Instructional errors are questions of law, which we review de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569–570, 76 Cal.Rptr.2d 239, 957 P.2d 928.) We must ascertain the relevant law and determine whether the given instruction correctly stated it. (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526, 3 Cal.Rptr.2d 677, 822 P.2d 385.) We address the three claims.

. . . .

**C. Instruction regarding aiding and abetting during Alex's robbery.**

In the final claim of instructional error, appellants argue the jury was improperly instructed regarding aiding and abetting during Alex's robbery (count II). Tracking the form language of CALCRIM No. 1603, the trial court instructed that, to be guilty of robbery as an aider and abettor, appellants must have "intended to aid before or while the perpetrator carried away the property to a place of temporary safety. A

39

perpetrator has reached a place of temporary safety with the property if he or she has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property." [Fn.33]

> [Fn.33] For aider and abettor liability in a robbery, "a getaway driver must form the intent to facilitate or encourage commission of the robbery prior to or during the carrying away of the loot to a place of temporary safety." (*Cooper, supra*, 53 Cal.3d at p. 1165, 282 Cal.Rptr. 450, 811 P.2d 742, fn. & italics omitted.) The bench notes to CALCRIM No. 1603 state a trial court should give CALCRIM No. 1603 "when the defendant is charged with aiding and abetting a robbery and an issue exists about when the defendant allegedly formed the intent to aid and abet." Our Supreme Court has clarified, "for the purpose of aiding and abetting, the duration of a robbery extends to the carrying away of the stolen property to a place of temporary safety." (*People v. Montoya, supra*, 7 Cal.4th at p. 1041, 31 Cal.Rptr.2d 128, 874 P.2d 903.)

Appellants collectively contend that CALCRIM No. 1603 did not require the necessary mens rea for robbery and it eliminated the actus reus requirement of aiding and abetting. They claim this instruction was misleading because nobody acted as a getaway driver. They assert the jury was permitted to find guilt without the accomplices knowing of the perpetrator's intent and without the accomplices doing anything to assist the perpetrator in escaping with Alex's property. Garcia and Segura argue that CALCRIM No. 1603 was presented as a "special instruction" for count II, making it likely the jury focused on it to the exclusion of other instructions.

Appellants' various assertions are without merit. When we examine the challenged instruction in the context of the arguments from counsel and the instructions as a whole, there is no reasonable likelihood the jury applied CALCRIM No. 1603 in an impermissible manner.

The trial court instructed the jury to pay careful attention to all instructions and to consider them together. They were informed some instructions may not apply depending on the facts, and they should not assume anything about the facts based on a particular instruction. The jury was instructed on how and when a person could be liable as an aider and abettor. This included the requirements the accomplice know the perpetrator's criminal intent and intend to assist in the commission of that crime. For robbery, the jury was told a defendant had to use force or fear to take property from another person's possession and against that person's will with the intent to permanently deprive possession.

During closing argument, the prosecutor made it very clear appellants robbed Alex when they attacked him. The prosecutor asserted appellants were each present when his property fell to the ground, and they intended to keep him subdued in order to take his property. The prosecutor never reasonably suggested that appellants were liable as accomplices in count II because they may have aided and abetted the perpetrator in carrying Alex's property to a place of temporary safety. [Fn.34] To the contrary, she argued the aiders and abettors formed the intent to rob when they participated in the group beating of Alex.

> [Fn.34] During closing argument, the prosecutor discussed the escape rule and asserted appellants never reached a place of temporary safety because they never left the park. She noted these crimes occurred about six minutes apart, which she described as "one continuous course of conduct." We reject any assertion a reasonable jury may have believed Garcia and Segura could

be liable as aiders and abettors for Alex's robbery because they never reached a place of temporary safety. To the contrary, the prosecutor made it very clear appellants robbed Alex when they applied force to him.

The defense attorneys generally asserted that Alex was never robbed. The defense attorneys argued appellants never formed an intent to steal Alex's property before or during the fight. Instead, this was a fight over a girl and Alex's property just fell out. If anything, only a theft or assault occurred.

We disagree it is likely the jury viewed CALCRIM No. 1603 in isolation. The written jury instructions were provided to the jurors when they began deliberations. Nothing reasonably suggests the jury would have disregarded the requirement to consider all instructions together. Nothing reasonably suggests the jury would have failed to consider whether an accomplice knew the perpetrator's criminal intent and intended to assist in the commission of that crime. Based on the arguments from counsel, nothing reasonably suggests the jury would have believed accomplice liability in count II was premised on assisting while the perpetrator carried Alex's property away.

Based on the entire record, the jury was properly instructed on the requirements for aiding and abetting a robbery. (See, e.g., *People v. McCoy, supra*, 25 Cal.4th at p. 1118, 108 Cal.Rptr.2d 188, 24 P.3d 1210 [explaining general accomplice liability requirements].) We reject appellants' assertions the jurors would have focused exclusively on CALCRIM No. 1603. We also reject their claims the jury applied this instruction in an impermissible manner. (See *People v. Houston, supra*, 54 Cal.4th at p. 1229, 144 Cal.Rptr.3d 716, 281 P.3d 799.) It is not reasonably likely the jurors understood CALCRIM No. 1603 in the manner appellants now assert. (See *People v. Cross, supra*, 45 Cal.4th at pp. 67–68, 82 Cal.Rptr.3d 373, 190 P.3d 706.) Accordingly, instructional error did not occur, and this claim fails.

Koplen, 2019 WL 2647356, at *36, 40-42.

> a.      Legal Standard and Analysis

As previously stated, to merit relief, a petitioner must show that the instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). In addition, the instruction must be considered in the context of the instructions as a whole and the trial record. Id. Moreover, a petitioner is not entitled to relief unless the instructional error resulted in actual prejudice. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Here, the state court reasonably determined that upon review of the instructions as a whole, the jury was correctly instructed on aiding and abetting, and there was no reasonable likelihood that the jury impermissibly applied CALCRIM No. 1603. The court noted that the jury was properly instructed on how and when a person could be liable as an aider and abettor, which included the requirements that the accomplice know the perpetrator's intent and intend to assist in

41

the commission of that crime. The prosecutor also argued that the accomplices formed the intent to rob when they participated in the group beating of Alex. The prosecutor did not argue the incorrect accomplice liability theory that Petitioner suggests, nor was there any evidence to support it. The state court reasonably found that the jury was properly instructed and that nothing in the record suggested that the jury relied exclusively on CALCRIM No. 1603 and misapplied it in the manner Petitioner claims.

Thus, Petitioner fails to show that the state court rejection of his claim was objectively unreasonable, and he fails to demonstrate any actual prejudice resulting from the alleged error. The claim should be denied.

7.    Instructional Error – Voluntary Intoxication

Petitioner contends that the instructions given on voluntary intoxication did not allow the jury to consider whether his intoxication negated the mental states required for his various crimes. This claim was also raised and rejected on direct appeal by the Fifth DCA, as follows:

**X. Reversal Is Not Required For Alleged Instructional Errors.**

Appellants raise three separate claims of instructional error. First, they argue instructional error occurred regarding the murder special-circumstance allegations. Second, Garcia and Segura contend instructional error occurred regarding voluntary intoxication. Finally, appellants claim error occurred regarding how the jury was instructed on aiding and abetting during Alex's robbery (count II).

Instructional errors are questions of law, which we review de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569–570, 76 Cal.Rptr.2d 239, 957 P.2d 928.) We must ascertain the relevant law and determine whether the given instruction correctly stated it. (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526, 3 Cal.Rptr.2d 677, 822 P.2d 385.) We address the three claims.

. . . .

**B. The voluntary intoxication instructions.**

Trial evidence suggested appellants were voluntarily intoxicated when these crimes occurred. Some evidence suggested Segura may have been more intoxicated than the others. In the afternoon before these crimes, it appears appellants each drank malt liquor from 40-ounce bottles. They also drank brandy. Koplen had about five shots. Garcia had about eight to 10 shots. Segura had about 10 shots.

The jury received two instructions regarding voluntary intoxication. With CALCRIM No. 625, the trial court generally tracked the form language and told the jury the following:

"You may consider evidence, if any, of the defendant's voluntary

42

intoxication *only in a limited way*. You may consider that evidence only in deciding whether *a defendant acted with the specific intent to take property by force or fear, robbery and attempted robbery*. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. *You may not consider evidence of voluntary intoxication for any other purpose*." (Italics added.)

With CALCRIM No. 3426, the court generally tracked the form language and told the jury the following:

> "You may consider evidence, if any, of a defendant's voluntary intoxication *only in a limited way*. You may consider that evidence only in deciding *whether a defendant acted with the intent to do the required act*.

> "*Robbery and attempted robbery* under [section] 211 or 664/211, the specific intent to deprive the owner of his property by force or fear.

> "For the gang enhancement [section 186.22, subdivision (b)(1) ], *the specific intent to promote, further, or assist in any criminal conduct by gang members*.

> "A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. *You may not consider evidence of voluntary intoxication for any other purpose*." (Italics added.)

Garcia and Segura contend these instructions did not accurately state the law because they applied to a perpetrator's specific intent and they precluded the jury from considering voluntary intoxication for aiders and abettors. They also argue these instructions precluded the jury from considering their voluntary intoxication regarding whether they acted with reckless indifference to human life.

Respondent does not address whether error occurred. Instead, respondent asserts any presumed error was harmless. According to respondent, the jury must have rejected a voluntary intoxication defense because appellants were convicted of robbery (count II).

We disagree instructional error occurred. In any event, we agree with respondent that any presumed error was harmless.

**1. Instructional error did not occur.**

Generally, if a trial court instructs on voluntary intoxication, it should inform the jury of the possible effect of voluntary intoxication on an aider and abettor's mental state. [Fn.31] (*People v. Letner and Tobin, supra*, 50 Cal.4th at p. 186, 112 Cal.Rptr.3d 746, 235 P.3d 62; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1134, 77 Cal.Rptr.2d 428, 959 P.2d 735.)

> [Fn.31] CALCRIM No. 404 provides, in relevant part: "If you conclude that the defendant was intoxicated at the time of the alleged crime, you may consider this evidence in deciding whether the defendant: [¶] A. Knew that <insert name of perpetrator> intended to commit <insert target offense>; [¶]

43

AND [¶] B. Intended to aid and abet <insert name of perpetrator> in committing <insert target offense>."

We reject Garcia's and Segura's assertions the jurors would have believed they could only consider voluntary intoxication for a perpetrator. The voluntary intoxication instructions did not mention the terms "perpetrators" or "aiders and abettors." Instead, the jury was told to consider "a defendant's voluntary intoxication" and whether a defendant acted with the specific intent to take property by force or fear, or "acted with the intent to do the required act."

Other instructions informed the jury a person may be guilty as either a perpetrator or an aider and abettor. The jury was instructed on the required elements to find liability for an aider and abettor. The jury was told someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and "specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commitment of that crime."

During closing argument, the prosecutor noted a perpetrator and an aider and abettor are equally guilty. During Segura's closing arguments, his counsel emphasized his client's voluntary intoxication. Segura's counsel asserted Koplen was "the lunatic" who alone stabbed Tylor. Segura's counsel emphasized his client was very intoxicated during these crimes. His counsel asserted Segura was too drunk to plan and coordinate an attack on Tylor and Brittany. He argued Segura was so drunk "he was not aware of his surroundings or that he knew what he was doing."

The prosecutor never argued or even suggested the jury could not consider voluntary intoxication in determining whether Garcia or Segura aided and abetted in the charged crimes. To the contrary, during her rebuttal argument, the prosecutor rejected Segura's claim he was too intoxicated to form specific intent. According to the prosecutor, Segura made numerous choices throughout these crimes which demonstrated specific intent. The prosecutor asserted it was Koplen who stabbed Tylor, making Segura an aider and abettor who chased and punched Tylor. The closing arguments make it clear the jury would not have understood these disputed instructions in the manner Garcia and Segura now claim. [Fn.32]

[Fn.32] Garcia claims we cannot look to the arguments of counsel to overcome the "strict prohibition" appearing in the instructions. We reject this assertion. In analyzing alleged instructional error, we must view all of the jury instructions and the trial record, including the arguments of counsel, to determine if it is reasonably likely the jury applied the instruction in an impermissible manner. (*People v. Houston, supra*, 54 Cal.4th at p. 1229, 144 Cal.Rptr.3d 716, 281 P.3d 799; *People v. Nem, supra*, 114 Cal.App.4th at p. 165, 7 Cal.Rptr.3d 478.)

Based on this record, it is not reasonably likely the jury applied the voluntary intoxication instructions in an impermissible manner. (See *People v. Houston, supra*, 54 Cal.4th at p. 1229, 144 Cal.Rptr.3d 716, 281 P.3d 799.) The voluntary intoxication instructions did not expressly state they were limited to perpetrators and, when read in context with the other instructions and closing arguments, it is not reasonably probable the jury would have believed voluntary intoxication had no application for aiders and abettors. A reasonable likelihood does not exist the jurors understood these disputed instructions in the manner Garcia and Segura now assert. (See *People v. Cross, supra*, 45 Cal.4th at pp. 67–68, 82 Cal.Rptr.3d 373, 190 P.3d 706.) As such, instructional error did not occur, and this claim fails. In any event, even if we assume instructional error was present, any presumed error was harmless.

44

## 2. Any presumed error was harmless.

The parties dispute the appropriate standard of review. Garcia and Segura contend a due process violation occurred, and prejudice should be reviewed under *Chapman, supra*, 386 U.S. 18, 87 S.Ct. 824. They argue these instructions precluded the jury from considering exculpatory evidence. In contrast, respondent asserts this was state law error. We agree with respondent.

Our Supreme Court makes clear that instructional error regarding voluntary intoxication is subject to the usual standard for state law error. (*People v. Covarrubias, supra*, 1 Cal.5th at p. 897; *People v. Letner and Tobin, supra*, 50 Cal.4th at p. 187, 112 Cal.Rptr.3d 746, 235 P.3d 62.) Under this standard, we must reverse only if it is reasonably probable the error adversely affected appellants' verdicts. (*People v. Covarrubias, supra*, at p. 897,; *People v. Letner and Tobin, supra*, at p. 187, 112 Cal.Rptr.3d 746, 235 P.3d 62.)

Here, contrary to his appellate claims, evidence of Garcia's voluntary intoxication was not critical to his defense. During his closing arguments, Garcia did not emphasize his voluntary intoxication. Although he noted he went to the park to drink and spend time with friends, he did not discuss his level of impairment. Instead, Garcia argued he did not commit the charged crimes. He generally claimed he was not involved in an attempted robbery of Tylor and Brittany. He asserted the evidence reasonably showed he did not have an intent to permanently deprive them of their property, he was not aware if another appellant held such an intent, and he only intended to "taunt or assault" Tylor and Brittany. He asserted Alex was never robbed.

During his closing argument, Segura also claimed Alex was never robbed. He maintained Koplen was "the lunatic" who alone stabbed Tylor. Segura emphasized his voluntary intoxication, claiming he was unable to plan and coordinate the attacks on Tylor and Brittany. Segura's counsel asserted that his client was not an aider and abettor even if his client was present when "this lunatic" (Koplen) stabbed Tylor. His counsel argued Segura had no blood or DNA evidence on him while Koplen went home but still had blood on him hours later.

The trial court's alleged instructional error did not prevent Garcia or Segura from presenting a complete defense or articulating their particular defense theories. (See, e.g., *People v. Pearson* (2012) 53 Cal.4th 306, 325, fn. 9, 135 Cal.Rptr.3d 262, 266 P.3d 966 ["The failure to give a fully inclusive pinpoint instruction on voluntary intoxication did not, contrary to defendant's contention, deprive him of his federal fair trial right"].) In any event, the evidence supporting the existing judgments is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, there is no reasonable probability this presumed error affected the result. (*People v. Breverman* (1998) 19 Cal.4th 142, 177, 77 Cal.Rptr.2d 870, 960 P.2d 1094.)

Finally, although the voluntary intoxication instructions did not mention the term "aiding and abetting," they also did not expressly limit their application to "perpetrators." The prosecutor did not argue that the jury could not consider voluntary intoxication for an aider and abettor. Nothing in the record reasonably suggests the jury would have believed that the mental states set forth in the voluntary intoxication instructions did not apply both to the mental states required of a direct perpetrator and to those required of an aider and abettor. (*People v. Covarrubias, supra*, 1 Cal.5th at p. 897.) "'For these reasons, any error in the instructions did not preclude the jury's consideration of defense evidence, nor is it reasonably probable

that different instructions would have resulted in a verdict more favorable to [appellants].'" (*Ibid.*, quoting *Letner and Tobin, supra*, 50 Cal.4th at p. 187, 112 Cal.Rptr.3d 746, 235 P.3d 62.) As such, based on this record, we can declare this presumed error harmless. Accordingly, prejudice is not present, and this claim fails.

Koplen, 2019 WL 2647356, at *38-40.

### a.      Legal Standard and Analysis

The same standard discussed in the previous claim applies, and like the previous claim, Petitioner fails to show that the state court rejection of the claim was objectively unreasonable. The state court reasonably determined that no instructional error occurred, and even if error occurred, it did not prejudice Petitioner.

The state court noted that when the instructions were considered as a whole, the jury was not misinformed on the voluntary intoxication defense.  First, the state court noted that jurors would not have believed they could only consider voluntary intoxication as to the perpetrator, because the instruction was not limited only to the perpetrator.  Instead, the jury was informed that it could consider "a defendant's voluntary intoxication."  Other instructions also informed the jury on the elements of aider and abettor liability for the crime, and that the perpetrator and an aider and abettor are equally guilty.  Second, the prosecutor neither argued nor suggested that the jury could not consider voluntary intoxication in determining whether Petitioner could be found guilty as an aider and abettor. In fact, in her rebuttal during closing remarks, the prosecutor argued against Petitioner's claim that he was too intoxicated to form specific intent.  Thus, Petitioner fails to show that the state court finding that instructional error did not occur was unreasonable.

In addition, the state court reasonably found that no prejudice occurred even if there was error.  Petitioner was not hindered in any way from arguing that voluntary intoxication prevented him from forming the specific intent to aid and abet.  In fact, Petitioner's counsel made this argument during closing remarks, specifically claiming that Petitioner was unable to form the intent to aid and abet.  For these reasons, Petitioner fails to show that the result would have been different had additional or different instructions been given.  The claim should be rejected.

/////

8. Prosecutorial Misconduct – Misstatement of Forensic Evidence

Petitioner claims that the prosecutor committed misconduct by misstating forensic evidence. Petitioner also faults his defense counsel for failing to object. Petitioner raised this claim on direct review in the state courts. In the last reasoned decision, the Fifth DCA denied the claim as follows:

**VII. Prosecutorial Misconduct Did Not Occur.**

Appellants raise three separate claims of prosecutorial misconduct centered around closing argument. First, they contend the prosecutor misstated law. Second, Garcia and Segura argue the prosecutor misled the jury regarding certain evidence. Finally, appellants claim the prosecutor improperly appealed to the jurors' emotions.

**A. Standard of review.**

A prosecutor's misconduct violates the federal Constitution and requires reversal when it infects the trial with such unfairness as to deny due process. (*People v. Tully* (2012) 54 Cal.4th 952, 1009, 145 Cal.Rptr.3d 146, 282 P.3d 173.) Under state law, a prosecutor's conduct not rendering a criminal trial fundamentally unfair is still misconduct if it involves the use of deceptive or reprehensible methods in attempting to persuade the trier of fact. (*Id.* at pp. 1009–1010, 145 Cal.Rptr.3d 146, 282 P.3d 173.)

**B. Analysis.**

We analyze and reject each of appellants' three claims of misconduct.

. . . .

**2. The prosecutor's alleged misstatements of evidence.**

During trial, a dispute arose whether Tylor suffered blunt force trauma to his face. The pathologist opined Tylor did not suffer any blunt force trauma consistent with a beating or punching. In contrast, during Koplen's case, he presented evidence from the responding police officer who had first located Tylor in the park. According to this evidence, Tylor had an accumulation of blood under his nostril, as well as blood inside his nose and above his upper lip. Photographic evidence suggested some bruising on and around Tylor's nose.

During closing argument, the prosecutor claimed that Tylor had been bleeding from his nose, which was consistent with blunt force trauma. The prosecutor argued the evidence of trauma to Tylor's face established "punch marks." She asserted this was the "greatest evidence of aiding and abetting" against Garcia and Segura. She referred to the pathologist's and responding officer's testimony as establishing this evidence.

In the present claim, Garcia and Segura argue the prosecutor misled jurors about the pathologist's opinions, and she misrepresented the officer's testimony. In contrast, respondent raises forfeiture to resolve this issue. We agree that Garcia and Segura have forfeited this issue. In any event, we do not discern any prejudice from the prosecutor's statements. Because these statements were harmless, neither Garcia nor

47

Segura establish ineffective assistance of counsel.

**a. This claim is forfeited.**

As a rule, a claim of prosecutorial misconduct is forfeited if the defense fails to object and fails to request an admonition to cure any harm. (*Centeno, supra*, 60 Cal.4th at p. 674, 180 Cal.Rptr.3d 649, 338 P.3d 938; *People v. Tully, supra*, 54 Cal.4th at p. 1010, 145 Cal.Rptr.3d 146, 282 P.3d 173.) "The defendant's failure to object will be excused if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*Centeno, supra*, 60 Cal.4th at p. 674, 180 Cal.Rptr.3d 649, 338 P.3d 938.)

Garcia and Segura argue any objection would have been futile. We disagree. The prosecutor's statements were not so extreme or pervasive that a prompt objection and admonition would not have cured the harm. (*Centeno, supra*, 60 Cal.4th at p. 674, 180 Cal.Rptr.3d 649, 338 P.3d 938.) As such, this claim is forfeited on appeal. In any event, we find no prejudice from the prosecutor's statements. Because these statements were harmless, neither Garcia nor Segura establish ineffective assistance of counsel.

**b. The prosecutor's statements were harmless, which negates ineffective assistance of counsel.**

To overcome forfeiture, Garcia and Segura assert their respective trial counsel rendered ineffective assistance. They also argue any presumed prosecutorial misconduct was prejudicial. We disagree. Although it is disputed whether the prosecutor committed misconduct, [Fn.26] we need not resolve that dispute because any presumed error was harmless.

> [Fn.26] In his briefing, Koplen rejects Garcia's and Segura's arguments the prosecutor misstated the evidence. According to Koplen, the trial evidence raised an inference Tylor had been punched in his face. Koplen contends the pathologist had referred to Tylor's torso when opining he suffered no bruising.

Some trial evidence suggested Tylor may have suffered blunt force trauma to his face. Both the responding officer and the photographic evidence suggested blood on Tylor's face. Although the prosecutor incorrectly attributed her conclusions to the pathologist, the prosecutor was permitted to state her belief that Tylor had been punched in his face. She was permitted to comment on the evidence admitted at trial and to urge whatever conclusions she deemed proper. (*People v. Panah* (2005) 35 Cal.4th 395, 463, 25 Cal.Rptr.3d 672, 107 P.3d 790.)

We do not believe the prosecutor's brief statements would have misled the jury. To the contrary, the court instructed the jury that nothing the attorneys said was evidence, including their closing arguments. The jurors were also told they had to decide the facts based on the evidence presented at trial. We presume the jurors were intelligent and capable of understanding and following the instructions given them. (*People v. Gonzales, supra*, 51 Cal.4th at p. 940, 126 Cal.Rptr.3d 1, 253 P.3d 185.) Nothing suggests we should disregard that presumption in this situation.

It is not reasonably probable Garcia or Segura would have obtained more favorable results in the absence of the prosecutor's statements or if defense counsel had objected. (See *People v. Tully, supra*, 54 Cal.4th at pp. 1009–1010, 145 Cal.Rptr.3d 146, 282 P.3d 173.) The evidence overwhelmingly established Garcia's and Segura's

liability for felony murder and the enhanced penalties under the murder special-circumstance allegations. The prosecutor's disputed comments were very brief, and this was not repeated or egregious behavior. These statements were not emphasized.

In addition, Segura asserted during his closing argument that the pathologist never saw blunt force trauma on Tylor's face. Instead, if Tylor had blood on his nose, it was from medical intervention. In contrast, Koplen argued to the jury that Tylor had been punched in his face, and Koplen argued he was the puncher. According to Koplen, the jury should disregard the pathologist's opinion and, instead, rely on the photographic evidence that suggested bruises on Tylor's nose. Based on the other arguments from counsel, we reject Garcia's and Segura's claims the prosecutor's brief comments must have improperly impacted the jurors.

Finally, it is not reasonably probable the result would have been different absent the prosecutor's statements. Confidence in the outcome of this matter is not undermined. (See *People v. Williams* (1997) 16 Cal.4th 153, 215, 66 Cal.Rptr.2d 123, 940 P.2d 710.) As such, because the prosecutor's statements were harmless, Garcia and Segura do not establish ineffective assistance of counsel. (See, e.g., *People v. Lucas* (1995) 12 Cal.4th 415, 436, 12 Cal.4th 825A, 436, 48 Cal.Rptr.2d 525, 907 P.2d 373 [defendant bears burden to establish both deficient performance and resulting prejudice in a claim of ineffective assistance of counsel].) Thus, we will not reverse their convictions. Accordingly, we reject this claim of prosecutorial misconduct, and we find no ineffective assistance of counsel.

Koplen, 2019 WL 2647356, at *21-22, 24-25.

### a.    Procedural Default

As noted above, the state court found that Petitioner had forfeited his claim by failing to object to the prosecutor's comments at trial. Respondent contends Petitioner's claim is thus procedurally defaulted.

A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief. Id. at 730. For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997). For the bar to be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S. 1032, 1040-41 (1983). If an issue is procedurally defaulted, a federal court may not consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

| | |
|---|---|
| 1 | alleged violation of federal law, or demonstrate that failure to consider the claims will result in a |
| 2 | fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50. |
| 3 |      The Ninth Circuit has repeatedly held that California's contemporaneous objection |
| 4 | doctrine is clear, well-established, has been consistently applied, and is an adequate and |
| 5 | independent state procedural rule.  Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002); |
| 6 | Vansickel v. White, 166 F.3d 953 (9th Cir. 1999).  The Ninth Circuit has held that the |
| 7 | contemporaneous objection rule also bars a claim of prosecutorial misconduct.  Jackson v. |
| 8 | Giurbino, 364 F.3d 1002, 1006-07 (9th Cir. 2004).  Petitioner did not challenge the prosecutor's |
| 9 | remarks at trial; therefore, he waived his claim in state court and is procedurally barred from |
| 10 | raising it here.  In any event, as discussed below, the claim is without merit. |
| 11 |                   **b.**     **Legal Standard and Analysis** |
| 12 |      As more fully set forth in Section 5, *supra*, Petitioner is entitled to habeas corpus relief |
| 13 | only if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting |
| 14 | conviction a denial of due process."  Donnelly, 416 U.S. at 643.  The Court must keep in mind |
| 15 | that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the |
| 16 | fairness of the trial, not the culpability of the prosecutor."  Smith, 455 U.S. at 219.  If |
| 17 | prosecutorial misconduct is established, and it was constitutional error, the error must be |
| 18 | evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 |
| 19 | (1993). |
| 20 |      During closing remarks, the prosecutor claimed that Tylor had sustained blunt force |
| 21 | trauma to his face, as evidenced by photographic evidence showing bruising on or around his |
| 22 | nose, and testimony from the responding officer who first located Tylor in the park that Tylor had |
| 23 | an accumulation of blood under the nostril and on his upper lip.  The prosecutor then referred to |
| 24 | the pathologist's and responding officer's testimony in support of the claim.  However, the |
| 25 | pathologist had opined that Tylor had not suffered any blunt force trauma consistent with a |
| 26 | beating or punching.  Petitioner claims the prosecutor misled the jury. |
| 27 |      The state court determined that even if the prosecutor misstated the conclusion that Tylor |
| 28 | had been punched, the error was harmless.  The photographic evidence and responding officer's |

testimony supported the prosecutor's assertion. Because there was evidence supporting the prosecutor's assertion, and since the jury was advised that the prosecutor's remarks did not constitute evidence and that the facts were to be based on the evidence, the state court reasonably determined that the jury could not have been misled by the prosecutor's alleged misstatement. The state court reasonably found that even in the absence of the prosecutor's remarks, or if defense counsel had objected, it was not probable that the result would have been any different.

For the same reasons, the state court reasonably rejected Petitioner's claim that defense counsel rendered ineffective assistance by failing to object at trial. Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. Strickland v. Washington, 466 U.S. 668, 694 (1984). As discussed above, Petitioner has not shown that it is reasonably probable that the result would have been different had counsel objected.

In sum, petitioner's claim is procedurally defaulted and meritless and should be rejected.

9.    Prosecutorial Misconduct – Closing Arguments

In his next claim, Petitioner alleges the prosecutor committed misconduct during closing arguments when she appealed to emotion, sympathy, and community. (Doc. 1-2 at 69-72.) In the last reasoned state court decision, the Fifth DCA rejected the claim as follows:

**VII. Prosecutorial Misconduct Did Not Occur.**

Appellants raise three separate claims of prosecutorial misconduct centered around closing argument. First, they contend the prosecutor misstated law. Second, Garcia and Segura argue the prosecutor misled the jury regarding certain evidence. Finally, appellants claim the prosecutor improperly appealed to the jurors' emotions.

**A. Standard of review.**

A prosecutor's misconduct violates the federal Constitution and requires reversal when it infects the trial with such unfairness as to deny due process. (*People v. Tully* (2012) 54 Cal.4th 952, 1009, 145 Cal.Rptr.3d 146, 282 P.3d 173.) Under state law, a prosecutor's conduct not rendering a criminal trial fundamentally unfair is still misconduct if it involves the use of deceptive or reprehensible methods in attempting to persuade the trier of fact. (*Id*. at pp. 1009–1010, 145 Cal.Rptr.3d 146, 282 P.3d 173.)

**B. Analysis.**

We analyze and reject each of appellants' three claims of misconduct.

. . . .

### 3. The prosecutor's alleged appeal to the jurors' emotions.

In their final claim, appellants contend the prosecutor improperly appealed to the jurors' emotions.

### a. Background facts for this claim.

At the end of the prosecutor's rebuttal, she made the following comments:

"[THE PROSECUTOR]: Ladies and Gentlemen, Tylor had the courage when he was hit in the back to resist that aggression and take off running. He had the courage to zigzag and lure his assailants away from Brittany. He's screaming the entire time. He had the courage in the midst of being chased to scream out, 'Leave her alone,' as he ran.

"He's bleeding from the nasal area. He is bruised on the nose, consistent with blunt force trauma. He had the courage to be beaten to keep her safe. He had the courage to take that beating. And you can see here from his blood that he did. He had the courage to stay there instead of running away and be stabbed to death repeatedly. Repeatedly. And his blood is there for you to see so that you know that it happened. And I can't get the picture out of my head.

"Remember [the officer] talking about coming over to the park? I can't get the picture out of my head about what [she] saw. So when you go back—"

Garcia's trial counsel objected the prosecutor's comments were an appeal to the jurors' emotions. Counsel stated, "What's in this District Attorney's mind is irrelevant to their duty to follow the law." The prosecutor responded, "Well, it was relevant when [defense counsel] argued." The trial court overruled the objection without comment. The prosecutor continued as follows:

"[THE PROSECUTOR]: I want to take you back to that minute when [the officer] looks across the street. And in the lights of [the officer's] car, [she] sees the reflection of a body on the ground. And [she] describes the steam coming from Tylor's body. And in that moment, Tylor has a very faint heartbeat and he's lying there waiting to die. And what are they doing? They're threatening Brittany, they're dumping evidence, and they're running from the cops."

Each attorney objected this misstated the evidence. The trial court overruled their objections. The prosecutor continued, saying appellants "dumped the knife, they dumped shirts, they ran from the cops, they [hid] out on another street corner." Counsel for Koplen and Garcia objected this misstated the evidence. The court overruled the objections, instructing the prosecutor to complete her argument. The final following exchanges occurred:

"[THE PROSECUTOR]: And all that time, Tylor is still laying on that ground. And he cries out for Brittany twice. He doesn't get it out. But he had the courage to do what he did. He suffered the pain and the ultimate—

"[COUNSEL FOR SEGURA]: Judge, I would object. This is outside the scope of rebuttal.

"THE COURT: It's overruled.

"[THE PROSECUTOR]: And when Brittany was scared, Tylor took her hand and he promised he would protect her. [Fn.27] And he did so that she may live to tell you the story, and she did.

> [Fn.27] The evidence strongly suggests Brittany saw Koplen in the park before these crimes occurred. She and Tylor walked past the park earlier in the evening. She saw a very intoxicated female being held by a male with long hair in a ponytail. She also saw more people on benches. Brittany told Tylor she was scared, and she held his hand tighter. He told her she "would be okay" and "he was there."

"[COUNSEL FOR GARCIA]: Objection, Your Honor, outside the scope.

"THE COURT: Overruled.

"(Video playing off record from 4:01 p.m. to 4:03 p.m.) [Fn.28]

> [Fn.28] The record establishes Brittany's 911 call was played to the jury.

"[THE PROSECUTOR]: How many times did she use the word 'they'? [¶] Tylor had the courage to do what he did. Brittany told you the story. Here's the pen. I hope you'll have the courage to do what you need to do. It's your decision, folks. It's your community. You decide."

After closing arguments, appellants moved for a mistrial based on prosecutorial misconduct. They asserted the prosecutor had appealed to the jurors' emotions, which brought Tylor's mother "to sobs in the courtroom." The trial court denied a mistrial. The court believed the prosecutor showed relevant evidence to the jury, and the prosecutor did not commit misconduct. The court did not believe the prosecutor "necessarily" asked the jury "to ignore the evidence and just sign the documents."

On appeal, appellants maintain the prosecutor used emotional pressure during her closing argument. They contend the jury "succumbed" and found them guilty of felony murder despite "weak evidence." We disagree. The prosecutor did not improperly appeal to the jurors' emotions and any presumed misconduct was harmless.

### b. The prosecutor did not improperly appeal to the jurors' emotions.

It is improper for a prosecutor to argue to a jury in a way suggesting emotions may reign over reason, to present inflammatory rhetoric that diverts the jury's attention from its proper role, or to invite an irrational, purely subjective response. (*People v. Leon* (2015) 61 Cal.4th 569, 605–606, 189 Cal.Rptr.3d 703, 352 P.3d 289 (*Leon*).) A prosecutor may not invite jurors "'to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim.' [Citation.] It is also improper to ask jurors to imagine the victim's thoughts during the last seconds of life. [Citations.]" (*Id.* at p. 606, 189 Cal.Rptr.3d 703, 352 P.3d 289.) "However, prosecutors have wide latitude to present vigorous arguments so long as they are a fair comment on the evidence, including reasonable inferences and deductions from it. [Citation.]" (*Ibid.*)

Two Supreme Court opinions, *Leon, supra*, 61 Cal.4th 569, 189 Cal.Rptr.3d 703, 352 P.3d 289, and *People v. Martinez* (2010) 47 Cal.4th 911, 105 Cal.Rptr.3d 131, 224 P.3d 877 are instructive in this situation.

In *People v. Martinez*, the defendant was convicted of raping, robbing and murdering one victim, and assaulting three other women. (*People v. Martinez, supra*, 47 Cal.4th at p. 917, 105 Cal.Rptr.3d 131, 224 P.3d 877.) During closing argument, the prosecutor referred to the murder victim as "'that poor lady,' 'that poor woman,' or as 'a very nice woman.'" (*Id*. at p. 956, 105 Cal.Rptr.3d 131, 224 P.3d 877.) The prosecutor described her assault "as a 'savage beating'" and expressed incredulity "'that one human being could do that to another being.'" (*Ibid*.) The prosecutor remarked about the "uneasiness" the jury might experience when viewing photos of the victim's injuries, which would reflect the defendant's "'true violent capabilities'" and the "'true measure'" of the victim's suffering. (*Ibid*.) The prosecutor told the jury it had the ability through its verdict to tell the community the murder victim was nice, gentle, and she did not "'engage in a one-night stand with the defendant.'" (*Ibid*.) Regarding the other victims, the prosecutor stated their memories "'will always be scarred from their individual suffering and the terror'" the defendant created. (*Ibid*.) The prosecutor remarked on how the victims looked uncomfortable when they faced the defendant in court. (*Ibid*.) The prosecutor described one victim's tears when she testified, asserting "it was 'insulting your intelligence'" for the defendant to claim he did not intend to rape her. (*Ibid*.) The *Martinez* court found no misconduct. The prosecutor's arguments were "fair comments" on the evidence. (*Id*. at p. 957, 105 Cal.Rptr.3d 131, 224 P.3d 877.) Moreover, these comments were not egregious, and they were relatively brief compared to the rest of the prosecutor's arguments. They could not, by themselves, have swayed the jury. (*Ibid*.)

In *Leon*, the prosecutor asserted during closing argument the defendant and his accomplices used "cruel and unnecessary violence" during their various crimes. The prosecutor focused on the "excessive violence" which occurred to "harm and terrify" the victims. (*Leon, supra*, 61 Cal.4th at p. 604, 189 Cal.Rptr.3d 703, 352 P.3d 289.) Regarding one particular robbery murder seen on a security camera, the prosecutor argued the victim was shot despite complying with the defendant's demands. The prosecutor asked the jury, "'What could [the victim] have done to cause a person to do that?'" (*Id*. at p. 605, 189 Cal.Rptr.3d 703, 352 P.3d 289.)

The *Leon* court rejected a claim of misconduct. Remarks about the defendant's "arrogant attitude," and the use of "excessive violence" were tied to specific evidence. (*Leon, supra*, 61 Cal.4th at p. 605, 189 Cal.Rptr.3d 703, 352 P.3d 289.) The prosecutor's argument "was based on photographs and testimony. It did not overtly encourage jurors to base their verdicts on passion or emotion." (Id. at p. 606, 189 Cal.Rptr.3d 703, 352 P.3d 289.) The Supreme Court stated, "Crimes of violence and intimidation are almost always upsetting. Discussing the manner in which they are committed is fair comment. There is no requirement that crimes of violence be described dispassionately or with philosophic detachment." (*Ibid*.)

The *Leon* court found "more problematic" the prosecutor's argument concerning the final robbery murder, which may have improperly invited the jury to view the case through the victim's eyes. (*Leon, supra*, 61 Cal.4th at p. 606, 189 Cal.Rptr.3d 703, 352 P.3d 289.) The Supreme Court, however, found no misconduct. The prosecutor had not invited the jury to place themselves in the victim's shoes or to imagine his suffering. Instead, she directed their attention to the surveillance video. She noted the victim was callously shot in the back despite complying with the defendant's demands. According to the high court, the prosecutor's brief observation was "fair

comment on the evidence and not so deceptive or unfair as to constitute misconduct under state or federal law. [Citations.] Moreover, any error was clearly harmless, since the evidence of defendant's guilt was overwhelming." (*Ibid.*)

Similar to *Leon, supra*, 61 Cal.4th 569, 189 Cal.Rptr.3d 703, 352 P.3d 289 and *People v. Martinez, supra*, 47 Cal.4th 911, 105 Cal.Rptr.3d 131, 224 P.3d 877, the prosecutor's challenged statements in the present matter fell within the permissible bounds of argument. We disagree that the prosecutor encouraged the jurors to base their verdicts on passion or emotion. Instead, the evidence surrounding Tylor's murder was disturbing and the prosecutor focused on the trial facts to show how he was callously and needlessly killed. The prosecutor's remarks about Tylor's courage and his behavior were based on Brittany's testimony. The comments about Tylor's injuries, and how he generally appeared when discovered, stemmed from the responding officer's testimony. The prosecutor noted that, around the time the officer found Tylor, appellants were threatening Brittany, dumping evidence, and fleeing from law enforcement. The prosecutor's statements were a fair comment on the evidence. Appellants confronted Brittany after abandoning Tylor. Appellants fled just before Brittany spoke to the 911 operator. One appellant discarded Alex's knife in the bushes, which law enforcement recovered about three and a half months later. Segura ran from police. The evidence overwhelmingly suggested appellants' indifference to Tylor's life.

As in *Leon*, we cannot state that the prosecutor's comments were "so deceptive or unfair as to constitute misconduct under state or federal law." (*Leon, supra*, 61 Cal.4th at p. 606, 189 Cal.Rptr.3d 703, 352 P.3d 289.) As in *People v. Martinez*, the prosecutor's brief comments about Tylor's pain and suffering were not egregious, and they were relatively brief compared to the rest of the prosecutor's arguments. They could not, by themselves, have swayed the jury. (*People v. Martinez, supra*, 47 Cal.4th at p. 957, 105 Cal.Rptr.3d 131, 224 P.3d 877.)

Finally, we reject appellants' arguments the prosecutor's reference to the "community" was an exhortation for the jurors to base their verdicts on emotion, outrage, and sympathy. To the contrary, the prosecutor asked the jurors to decide the case based on the evidence. She asked the jury to make tough decisions and hold appellants accountable. The prosecutor's reference to the community was not misconduct. (See *People v. Martinez, supra*, 47 Cal.4th at p. 957, 105 Cal.Rptr.3d 131, 224 P.3d 877; see also *People v. Covarrubias* (2016) 1 Cal.5th 838, 895, 207 Cal.Rptr.3d 228, 378 P.3d 615 [finding no misconduct when prosecutor asked jury what the "'community'" would and would not tolerate]; *People v. Carpenter* (1997) 15 Cal.4th 312, 397, 63 Cal.Rptr.2d 1, 935 P.2d 708 [prosecutor's reference to the "measure of a society" during closing argument was not misconduct but part of a plea for jurors to consider the case carefully and base verdicts on the truth], superseded by statute on other grounds as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106–1107, 77 Cal.Rptr.3d 287, 183 P.3d 1250.)

Based on this record, the prosecutor did not improperly appeal to the juror's emotions, and these disputed statements were not "so deceptive or unfair as to constitute misconduct under state or federal law." (*Leon, supra*, 61 Cal.4th at p. 606, 189 Cal.Rptr.3d 703, 352 P.3d 289.) [Fn.29] As such, this claim fails. In any event, even if the prosecutor's comments could be construed as an improper appeal to the jurors' emotions, any presumed misconduct was harmless.

[Fn.29] Because misconduct did not occur, we reject appellants' contentions the trial court impliedly endorsed improper argument through its denial of the various defense objections.

55

### c. Any presumed misconduct was harmless.

Prior to deliberations, the trial court instructed the jurors they alone had to decide the facts of the case. They were instructed not to let "bias, sympathy, prejudice, or public opinion influence your decision." The court told the jurors they must consider the evidence and charges separately for each appellant. The jury was instructed the prosecution had to prove its case beyond a reasonable doubt, and nothing the attorneys said was evidence.

The jurors were given a written copy of the jury instructions when deliberations commenced. They began deliberations in the late afternoon following the prosecutor's rebuttal argument. They deliberated over five additional days (with breaks in between) before their verdicts were announced on the sixth day. Given the relatively lengthy deliberations, nothing reasonably suggests the prosecutor's disputed comments may have negatively impacted the jury. To the contrary, we presume the jurors understood and followed the trial court's instructions. (See *People v. Martinez, supra,* 47 Cal.4th at p. 957, 105 Cal.Rptr.3d 131, 224 P.3d 877; see also *People v. Gonzales, supra,* 51 Cal.4th at p. 940, 126 Cal.Rptr.3d 1, 253 P.3d 185.)

As in *Leon* and *People v. Martinez,* the evidence of appellants' guilt was overwhelming. (*Leon, supra,* 61 Cal.4th at p. 606, 189 Cal.Rptr.3d 703, 352 P.3d 289; *People v. Martinez, supra,* 47 Cal.4th at p. 957, 105 Cal.Rptr.3d 131, 224 P.3d 877.) Appellants worked together in robbing Alex and they worked together during the attempted robberies connected to Tylor's death. Garcia and Segura were major participants in the attempted robberies and they acted with reckless indifference to life. It is not reasonably probable appellants would have obtained more favorable results without the prosecutor's disputed comments. (See *People v. Martinez, supra,* 47 Cal.4th at p. 957, 105 Cal.Rptr.3d 131, 224 P.3d 877.) These comments also did not infect the trial with such unfairness as to render the verdicts unreliable or to make appellants' convictions a denial of due process. (See *People v. Tully, supra,* 54 Cal.4th at p. 1009, 145 Cal.Rptr.3d 146, 282 P.3d 173.) Accordingly, any presumed prosecutorial misconduct was not prejudicial, and this claim fails.

Koplen, 2019 WL 2647356, at *21-22, 25-29).

### a.      Legal Standard and Analysis

As with the previous claim, the state court reasonably determined that the prosecutor's actions did not constitute misconduct and that those actions did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. Petitioner contends that the prosecutor encouraged the jurors to base their verdicts on passion or emotion. The state court, however, reasonably found that the prosecutor's remarks constituted fair comment on the evidence.

The state court noted that the prosecutor's discussion of how Tylor was callously and needlessly killed was borne out by the actual facts of the murder. Brittany's testimony likewise supported the prosecutor's remarks about Tylor's courage and his behavior. The state court

further noted that the prosecutor's comments about Tylor's injuries, and how he generally appeared when discovered, were based on the responding officer's testimony. Finally, the state court noted that the prosecutor's remarks on how the defendants behaved after they had murdered Tylor, in threatening Brittany, dumping evidence, and fleeing from law enforcement, were based on Brittany's testimony, the knife discovered in the bushes, and Petitioner's flight from police. Petitioner has not shown that the prosecutor's statements were anything but fair commentary on the evidence.

The state court also reasonably determined that Petitioner failed to demonstrate any prejudice resulting from the prosecutor's remarks. See Brecht v. Abrahamson, 507 U.S. 619 (1993). All of the prosecutor's remarks were tied to actual evidence in the case. The trial court cautioned the jury not to let "bias, sympathy, prejudice, or public opinion influence [it's] decision." The appellate court noted that the jury deliberated for over five days, and there was nothing to suggest that the jurors acted based on their emotions as a result of the prosecutor's remarks. In light of the foregoing, the Court finds that Petitioner has failed to show that the state court rejection of his claim was contrary to, or an unreasonable application of, Supreme Court authority. The claim should be denied.

> 10.     Instructional Error – Lesser Included Offenses

Petitioner next contends that the trial court erred in refusing to instruct the jury on the lesser-included homicide offenses of second-degree murder and involuntary manslaughter, and on assault and battery as lesser offenses of robbery. (Doc. 1-2 at 72-74.) The appellate court rejected the claim on direct review, as follows:

> **XI. Reversal Is Not Required For The Trial Court's Failure To Instruct On Lesser Included Offenses Regarding Murder And Robbery.**
>
> Appellants claim the trial court prejudicially erred in failing to instruct the jury regarding lesser included forms of murder in count I, such as second degree murder and involuntary manslaughter. They also contend the court prejudicially erred in failing to instruct on assault and/or battery as lesser included offenses to Alex's robbery in count II.
>
> **A. Standard of review.**
>
> A de novo standard of review is used when a trial court has allegedly failed to instruct on an assertedly lesser included offense. (*People v. Cole* (2004) 33 Cal.4th

57

1158, 1218, 17 Cal.Rptr.3d 532, 95 P.3d 811.) A trial court is required to instruct the jury on a lesser included offense only if there is substantial evidence absolving the defendant from guilt of the greater offense but not the lesser. (*Ibid*.) Substantial evidence in this regard has been defined as evidence a reasonable jury could find persuasive. (*Ibid*.) In reviewing this claim, we are to view the evidence in the light most favorable to appellants. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137, 166 Cal.Rptr.3d 217.)

**B. Analysis.**

We address both of appellants' claims.

### 1. The failure to instruct was harmless regarding the lesser included offenses to murder.

Based on a recent Supreme Court opinion, we can quickly dispose of the claim the jury should have been instructed on necessarily lesser included offenses to murder in count I.

In *People v. Gonzalez* (2018) 5 Cal.5th 186, 233 Cal.Rptr.3d 791, 418 P.3d 841 (*Gonzalez*), our high court held that, if a jury finds true a special circumstance allegation that a killing occurred during the commission of a felony, that finding "necessarily demonstrates the jury's determination that the defendant committed felony murder rather than a lesser form of homicide. [Citations.] Such a finding therefore renders harmless the failure to instruct on lesser included offenses of murder with malice aforethought and the associated prejudice created by an all-or-nothing choice." (*Id*. at p. 200.)

In this case, the trial court instructed the jury only on first degree felony murder. The jury was not instructed on murder with malice aforethought or the lesser included offenses. However, the jury found true the special circumstance allegations that Tylor's murder occurred during attempted robbery.

As in *Gonzalez*, the trial court told the jury to first decide the issue of felony murder before considering the special circumstance allegations. (*Gonzalez, supra*, 5 Cal.5th at p. 202.) The special circumstance findings required additional elements beyond those necessary to convict appellants for felony murder. In finding true the special circumstance allegations against appellants, the jury necessarily determined the aiders and abettors either intended to kill, or they were "'major participants'" who acted with "'reckless indifference to human life.'" (*Id*. at p. 203.) Based on the jury's true findings, and following the high court's reasoning in *Gonzalez*, it is inconsistent to believe appellants could have committed a crime of lesser magnitude than felony murder. [Fn.35] (*Gonzalez*, at p. 203.) As such, the trial court's failure to instruct on lesser included offenses to murder was harmless. (*Gonzalez*, at p. 200.) It is not reasonably probable a different result would have occurred with additional instructions. (*Id*. at p. 201.) Accordingly, prejudice is not present, and we reject this claim.

> [Fn.35] Garcia argues the jury's robbery-murder special-circumstance findings do not demonstrate harmless error, contending the evidence of felony murder was not clear. (See *People v. Campbell* (2015) 233 Cal.App.4th 148, 172–173, 182 Cal.Rptr.3d 491.) We disagree. The evidence overwhelmingly shows that appellants committed felony murder during an attempted robbery. As such, the failure to instruct on lesser included offenses to murder was harmless. (See *Gonzalez, supra*, 5 Cal.5th

1   at p. 200.)

2   **2. The trial court had no duty to instruct on assault and/or
    battery in count II and any presumed instructional error was
3   harmless.**

4   In count II, the trial court instructed the jury on the elements necessary for robbery.
    The court also instructed the jury on the lesser included offense of theft.
5
6   Based on the accusatory pleading test, appellants claim the trial court erred in failing
    to instruct on assault and/or battery as lesser included offenses in Alex's robbery
    (count II). We disagree. The court had no duty to instruct on assault and/or battery,
7   and any presumed error was harmless.

8   Two tests are used to determine "whether a crime is a lesser included offense of a
    greater offense: the elements test and the accusatory pleading test. [Citation.] Either
9   of these tests triggers the trial court's duty to instruct on lesser included offenses."
    (*Gonzalez, supra*, 5 Cal.5th at p. 197.) "Under California law, a lesser offense is
10  necessarily included in a greater offense if either the statutory elements of the greater
    offense, or the facts actually alleged in the accusatory pleading, include all the
11  elements of the lesser offense, such that the greater cannot be committed without
    also committing the lesser." (*People v. Birk*s (1998) 19 Cal.4th 108, 117, 77
12  Cal.Rptr.2d 848, 960 P.2d 1073.)

13  **a. Assault and/or battery are not necessarily lesser
    included offenses to robbery.**
14
15  Robbery is "the felonious taking of personal property in the possession of another,
    from his person or immediate presence, and against his will, accomplished by means
    of force or fear." (§ 211.) A simple assault is "an unlawful attempt, coupled with a
16  present ability, to commit a violent injury on the person of another." (§ 240.) A
    battery is "any willful and unlawful use of force or violence upon the person of
17  another." (§ 242.)

18  The California Supreme Court has indicated battery is not a lesser included offense
    of robbery. (*People v. Tufunga* (1999) 21 Cal.4th 935, 949, 90 Cal.Rptr.2d 143, 987
19  P.2d 168.) A battery cannot be accomplished without touching the victim. (*People
    v. Marshall* (1997) 15 Cal.4th 1, 38, 61 Cal.Rptr.2d 84, 931 P.2d 262.) Likewise,
20  our high court has held assault is not a lesser included offense of robbery under the
    elements test. (*People v. Parson* (2008) 44 Cal.4th 332, 349, 79 Cal.Rptr.3d 269,
21  187 P.3d 1; *People v. Wolcott* (1983) 34 Cal.3d 92, 100, 192 Cal.Rptr. 748, 665 P.2d
    520.) This is so because a robbery can be committed strictly by means of fear.
22  (*People v. Parson, supra*, 44 Cal.4th at p. 349, 79 Cal.Rptr.3d 269, 187 P.3d 1.)

23  In this case, the information alleged appellants committed the robbery in count II by
    means of "force and fear." Appellants assert that, because "force" was alleged, the
24  court was obligated to instruct on assault and/or battery under the pleadings test. We
    disagree.
25
26  The appellate court in *People v. Wright* (1996) 52 Cal.App.4th 203, 59 Cal.Rptr.2d
    316 (*Wright*) addressed a similar issue. In *Wright*, the defendants were convicted of
    first degree murder in the course of a robbery. (*Id*. at p. 205, 59 Cal.Rptr.2d 316.)
27  The defendants were charged with robbery and attempted robbery by means of
    "force *and* fear." (*Id*. at pp. 209–210, 59 Cal.Rptr.2d 316.) The *Wright* court
28  questioned whether the force required to commit a robbery necessarily includes the

59

force required to commit an assault. (*Id*. at p. 210, 59 Cal.Rptr.2d 316.) It rejected that argument, explaining the term "'force'" used in a robbery has a "broader meaning" than a mere "physical corporeal assault." (*Ibid*.) The common meaning of "'force'" includes a "'*threat* or *display* of physical aggression toward a person as *reasonably inspires fear* of pain, bodily harm, or death.' [Citation.]" (*Id*. at pp. 210–211.) *Wright* held, because the element of force can be satisfied by evidence of fear, "it is possible to commit a robbery by force without necessarily committing an assault. Consequently, under the 'accusatory pleading' test, assault is not necessarily included when the pleading alleges a robbery by force." (*Id*. at p. 211, 59 Cal.Rptr.2d 316.)

We agree with *Wright*. Because the element of force can be satisfied by evidence of fear, it is possible to commit a robbery without necessarily committing an assault or a battery. As such, under the accusatory pleading test, neither assault nor battery are necessarily included offenses even when the pleading alleges a robbery by force. (See *Wright, supra*, 52 Cal.App.4th at p. 211.)

Appellants acknowledge *Wright* and its potential applicability in this matter. However, they urge us to reject *Wright* as poorly reasoned and inconsistent with other authority. We decline to do so. We find *Wright* persuasive and will follow it here. As such, neither assault nor battery are lesser included offenses of robbery. Thus, the trial court did not have a sua sponte duty to instruct the jury on either assault or battery in count II. (See *People v. Parson, supra*, 44 Cal.4th at p. 349, 79 Cal.Rptr.3d 269, 187 P.3d 1; *People v. Wolcott, supra*, 34 Cal.3d at p. 100, 192 Cal.Rptr. 748, 665 P.2d 520; *Wright, supra*, 52 Cal.App.4th at p. 211.) Accordingly, this claim fails. In any event, even if the court had an instructional duty, any presumed error was harmless.

**b. Any presumed error was harmless.**

The state standard is used to analyze prejudice following a trial court's failure to instruct the jury on an alternative theory that would have allowed it to convict a defendant of the same crime. (*Gonzalez, supra*, 5 Cal.5th at pp. 198–199.) Under the state standard, appellants must show a different result was reasonably probable. (*Gonzalez, supra*, 5 Cal.5th at p. 201; see also *People v. Breverman, supra*, 19 Cal.4th at p. 178, fn. 25, 77 Cal.Rptr.2d 870, 960 P.2d 1094.)

Here, any alleged failure to instruct the jury on assault and battery was harmless. During Segura's closing argument, he asserted he could not be liable for robbery in count II based on his level of intoxication. He also argued nobody robbed Alex. Segura described Alex as a "thug" who brought the knife to the park. Segura claimed Alex's knife was not taken by force or fear, but it fell from his hoodie during the altercation. Instead of a robbery, this was a fight over a girl.

During Koplen's closing argument, he asserted that, if anything, only a theft occurred during the incident with Alex. He described this as a "beat down" of Alex, and nobody saw any appellant take Alex's property.

During Garcia's closing argument, he also claimed the incident with Alex "was over a girl." He asserted that Alex was never threatened, and Alex never stated that someone had reached into his pockets. His counsel asked the jury to find Garcia not guilty on all counts.

The trial court instructed the jury on the lesser included offense of theft. Despite this alternative charge, the jury found appellants guilty of robbery in count II. Based on

the arguments from defense counsel and the verdicts rendered in count II, it is not reasonably probable appellants would have obtained a more favorable outcome if the jury had been instructed on the crimes of assault and/or battery.

Based on this record, appellants have not established a reasonable probability a different result would have occurred absent the trial court's alleged instructional error. (See *Gonzalez, supra*, 5 Cal.5th at p. 201.) Even if the jury had received instruction on assault and/or battery in count II, it is abundantly clear the jury would have still found appellants liable for robbery. Accordingly, any presumed error was harmless, and this claim fails.

Koplen, 2019 WL 2647356, at *42-45.

### a. Failure to Present a Cognizable Federal Claim

The claim fails to present a federal question. "[T]he failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional question," Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998), because there is no clearly established federal constitutional right to lesser-included offense instructions in non-capital cases. United States v. Rivera-Alonzo, 584 F.3d 829, 834 n. 3 (9th Cir. 2009) (citing Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000)). The Court cannot find a constitutional right to a lesser-included offense instruction here as that would require the application of a new rule of law, something the court cannot do under the holding in Teague v. Lane, 489 U.S. 288 (1989). See Solis, 219 F.3d at 929 (habeas relief for failure to instruct on lesser included offense in non-capital case barred by Teague because it would require the application of a new constitutional rule); Turner v. Marshall, 63 F.3d 807, 819 (9th Cir.1995*), overruled on other grounds by* Tolbert v. Page, 182 F.3d 677 (9th Cir.1999) (*en banc*) (same).

For the same reasons, Petitioner's claim cannot survive scrutiny under 28 U.S.C. § 2254(d). Federal habeas relief is barred unless Petitioner can demonstrate that the state court's alleged failure was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Since there is no clearly established Supreme Court authority requiring lesser-included offense instructions in a non-capital case, Petitioner's claim is barred under § 2254(d).

### b. Harmless Error

As reasonably determined by the state court, even if the failure to *sua sponte* instruct on

lesser offenses constituted error, it was harmless because the evidence did not warrant such instructions. The state court noted that the jury found true the special circumstance allegation that a killing occurred during commission of a felony. This finding necessarily shows that the jury had determined Petitioner committed felony murder rather than a lesser form of homicide. Thus, even if the trial court had instructed on lesser offenses, the result would have been the same.

The state court also reasonably found that the trial court did not err in not instructing the jury on assault and/or battery as a lesser-included offense to robbery. The appellate court determined that under California law, assault and/or battery are not lesser-included offenses to robbery. The federal court is bound by the state court's determination on state law. Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (*per curiam*). Moreover, any error to so instruct was harmless. As noted by the state court, neither Petitioner nor his co-defendants presented a defense compatible with the omitted instructions. Even if the jury had been instructed on assault and/or battery, there is no reasonable probability that the jury would not have found Petitioner guilty of robbery.

Based on the record, the state court's rejection of the claim was objectively reasonable, and the claim should be rejected.

## 11. Confrontation Clause

Petitioner alleges that the trial court violated his due process rights under the Confrontation Clause when the court admitted testimonial hearsay concerning multiple police and probation department reports. (Doc. 1-2 at 74-80.) The claim was also raised on direct appeal. The appellate court denied the claim as follows:

> **VIII. The Failure To Bifurcate The Gang Allegations Did Not Cause A Fundamentally Unfair Trial And The *Sanchez* Error Was Harmless.**
>
> Prior to trial, appellants sought bifurcation of the gang allegations (§ 186.22, subd. (b)(1)) from the substantive charges. The trial court denied bifurcation.
>
> Gang evidence was introduced at trial. The prosecution's gang expert discussed the history of the Norteño criminal street gang, including its development in the Modesto area, its color (red) and its other identifying marks. The expert explained how a person becomes a Norteño member, how the gang is organized, and he discussed the gang's rivals. The expert informed the jury about the types of crimes the gang commits, including drug sales, assaults, robberies and murders. According to the expert, if a group of younger gang members (foot soldiers) were together and

62

one was involved in an altercation, the others would be expected to assist. The expert discussed two predicate offenses committed by other Norteño gang members. One conviction involved a burglary and the other was an assault with a deadly weapon.

At trial, the prosecution's gang expert reviewed prior gang-related incidents for each appellant. The gang expert detailed six incidents involving Koplen. These included his association with known gang members, a school fight, underage drinking, and an arrest for a probation violation. The jury heard about five incidents involving Garcia. These included association with known gang members and a curfew violation. The expert discussed 16 incidents involving Segura. These involved assault, vandalism, association with known gang members, possessing marijuana, underage drinking, and an attempted vehicle theft. The expert relied on these prior incidents in opining appellants were Norteño gang members when these crimes occurred.

In separate but related arguments, appellants claim the trial court prejudicially abused its discretion when it denied bifurcation of the gang allegations. They assert the gang evidence was not relevant. They further contend the bifurcation ruling resulted in "gross unfairness" amounting to a denial of due process. They rely on *People v. Albarran* (2007) 149 Cal.App.4th 214, 57 Cal.Rptr.3d 92 (*Albarran*). Finally, they argue *Sanchez* error occurred at trial because the prosecution relied on testimonial hearsay to establish the prior gang-related incidents for each appellant.

We agree *Sanchez* error occurred. Without recounting each disputed piece of evidence, it is clear the prosecution's gang expert based his opinions, at least in part, on "case-specific facts" about appellants. These facts were asserted by other law enforcement personnel and appeared in reports relating to potential criminal activity. These statements were not made in the context of an ongoing emergency. As such, these statements were "testimonial" hearsay and violated the confrontation clause. (*Crawford v. Washington* (2004) 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177; *Sanchez, supra*, 63 Cal.4th at pp. 685–686, 694, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Consequently, these statements should not have been introduced at trial and we must analyze prejudice.

A federal constitutional error is harmless under *Chapman, supra*, 386 U.S. 18, 87 S.Ct. 824, when the reviewing court determines beyond a reasonable doubt the error did not contribute to the verdict. (*People v. Aranda, supra*, 55 Cal.4th at p. 367, 145 Cal.Rptr.3d 855, 283 P.3d 632.) An error did not contribute to the verdict when the record reveals the error was unimportant in relation to everything else the jury considered on the issue in question. (*Yates v. Evatt, supra*, 500 U.S. at p. 403, 111 S.Ct. 1884.) The inquiry is whether the guilty verdict rendered in this trial was "surely unattributable to the error." (*Sullivan v. Louisiana, supra*, 508 U.S. at p. 279, 113 S.Ct. 2078.)

We determine the *Sanchez* error was harmless. In addition, we conclude the introduction of the remaining gang-related evidence neither caused a fundamentally unfair trial nor was prejudicial. As such, we need not analyze whether the court abused its discretion in denying bifurcation prior to trial. Instead, we can resolve the gang-related appellate issues through harmless error analysis.

**A. Koplen's arguments regarding prejudice.**

At trial, the prosecution's gang expert reviewed six prior gang-related incidents involving Koplen. One of these incidents involved a knife.

In 2011, Koplen was at a mall with a group of juveniles. They were wearing red and following another group of juveniles who were wearing blue. A police officer heard Koplen yelling out gang taunts, and Koplen held his hands up like he was challenging the rival group to a fight. The officer tried to stop Koplen, and he put his hand on Koplen's chest. Koplen pushed the officer's hand away and said, "Don't fuckin' touch me." The officer arrested Koplen and searched him, finding a switchblade.

Koplen contends the evidence of his prior knife possession was a key reason the jury found him guilty. He notes neither Garcia nor Segura had such evidence introduced against them. He recounts how Brittany's identification of her attacker changed over time. He maintains the jury focused on him as the stabber and, absent this error, the jurors would have likely determined Segura wielded the knife during the attempted robberies in counts III and IV. We disagree.

The circumstantial evidence overwhelmingly suggests it was Koplen, and not Segura, who threatened Brittany and stabbed Tylor. Koplen possessed Alex's phone when he was arrested the following morning. Forensic evidence linked Koplen to Tylor's murder. Tylor's DNA profile was a major contributor to some apparent blood found on Koplen's right ring finger. Tylor's DNA profile also matched an apparent blood stain found on an area of Koplen's jeans. In contrast, although Segura had blood on the front left cuff of his undershirt, this sample was too complex for interpretation because it had multiple contributors. Forensic evidence did not connect Segura to Tylor's homicide in the way it connected Koplen.

The jury was entitled to make reasonable inferences based on the circumstantial evidence. (*People v. Livingston, supra*, 53 Cal.4th at p. 1166, 140 Cal.Rptr.3d 139, 274 P.3d 1132.) Based on his possession of Alex's phone and the forensic evidence directly connecting him to Tylor's murder, the jury could have reasonably inferred it was Koplen, and not Segura, who used Alex's knife during Brittany's attempted robbery and Tylor's murder. Indeed, the jury could have reasonably determined the blood on Koplen's right ring finger occurred because he stabbed Tylor. This record offers reasonable and compelling explanations why the jury treated Koplen and Segura differently. Consequently, we reject Koplen's claim the gang evidence caused the jury to focus on him.

Further, regardless of Brittany's inconsistent statements about the identity of her attacker, overwhelming evidence established that Koplen was a major participant who acted with reckless indifference to human life during the attempted robberies connected to Tylor's murder. Brittany made it clear all three appellants chased after Tylor, and they returned to intimidate her after Tylor was fatally stabbed and screaming in pain. DNA evidence connected Koplen to Tylor's murder. Thus, under either a direct theory of liability or as an aider and abettor, the evidence conclusively established Koplen's liability for felony murder. (See §§ 189, subd. (e)(3), 190.2, subd. (d).)

Finally, the trial court instructed the jurors they could not conclude from the gang evidence appellants had a "bad character" or they had "a disposition to commit crime." We presume the jurors understood this instruction and applied it. (*People v. Gonzales, supra*, 51 Cal.4th at p. 940, 126 Cal.Rptr.3d 1, 253 P.3d 185.) Nothing suggests we should disregard this presumption. Indeed, the jury rejected the gang enhancement allegations under section 186.22, subdivision (b)(1). It is clear from this record the gang evidence did not prejudice Koplen.

*////*
*////*

**B. Garcia's and Segura's arguments regarding prejudice.**

Garcia and Segura assert the *Sanchez* error was prejudicial because the jurors may have used the gang evidence to decide guilt. They argue this error was exacerbated by the instruction given under CALCRIM No. 1403, which generally advises a jury to consider gang evidence only for the gang-related crimes, enhancements and/or special circumstance allegations. (CALCRIM No. 1403.) In this case, however, the court told the jurors to consider the gang evidence "only for the limited purpose of deciding whether a defendant acted with the intent, purpose, and knowledge that are required to prove the *gang-related crime charged....* You may not consider this evidence for any other purpose." (Italics added.) Garcia and Segura note the court did not instruct the jury to use the gang evidence only for the *gang enhancements* and *special circumstance allegations*. As such, they contend the jury was directed to use the gang evidence to decide guilt on the substantive charges. We find their contentions unpersuasive.

Contrary to Garcia's and Segura's claims, it was not the gang evidence which suggested appellants' guilt. To the contrary, appellants' coordinated and synchronized actions overwhelmingly established their intent to jointly commit the charged crimes. Segura directed Koplen and Garcia to attack Alex. All three kept Alex on the ground while his property was taken. All three approached Tylor and Brittany. Garcia and Segura chased Tylor while Koplen threatened Brittany with the knife. Appellants returned as a group to intimidate Brittany after Tylor was fatally stabbed. During the attempted robberies, Garcia and Segura acted with reckless indifference to human life. They were subjectively aware their participation in the attempted robberies involved a grave risk of death. Their involvement in the attempted robberies was "substantial" and "greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Banks, supra*, 61 Cal.4th at p. 802, 189 Cal.Rptr.3d 208, 351 P.3d 330.) The gang evidence had little, if any, impact on the jury's ultimate conclusions that Garcia and Segura aided and abetted in the charged crimes.

Finally, despite the introduction of relatively voluminous gang evidence, the jury rejected the gang enhancement allegations under section 186.22, subdivision (b)(1). The jury also acquitted Garcia and Segura of the attempted robberies in counts III and IV. The verdicts contradict Garcia's and Segura's contentions the *Sanchez* error was prejudicial. This is true despite any concern over the wording of CALCRIM No. 1403. It is clear from this record the admission of the gang evidence did not prejudice Garcia or Segura.

Koplen, 2019 WL 2647356, at *29-32.

### a.    Legal Standard

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const., Amend. VI.  The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53–54 (2004); Davis v. Washington, 547 U.S. 813, 821 (2006).  The Confrontation Clause

applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'" Crawford, 541

U.S. at 51 (citation omitted); Davis, 547 U.S. at 823–24. "'Testimony,' in turn, is typically a

solemn declaration or affirmation made for the purpose of establishing or proving some fact."

Crawford, 541 U.S. at 51 (citation and some internal punctuation omitted); Davis, 547 U.S. at

824. Nevertheless, the Confrontation Clause "does not bar the use of testimonial statements for

purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n. 9.

Additionally, a Confrontation Clause violation is subject to harmless error analysis. Delaware v.

Van Arsdall, 475 U.S. 673, 684 (1986). A Confrontation Clause violation is harmless, and does

not justify habeas relief, unless it had substantial and injurious effect or influence in determining

the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

b.      Analysis

Here, the state court applied the correct legal standard under the Sixth Amendment by

applying Crawford, 541 U.S. 36. The court concluded that some of the evidence presented was

inadmissible hearsay under the rule expressed in People v. Sanchez, 63 Cal.4th 665 (2016);

however, any error was harmless under the standard articulated in Chapman v. California, 386

U.S. 18 (1967). The Supreme Court has held that "[w]hen a Chapman decision is reviewed under

AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness*

*determination itself* was unreasonable.'" Davis v. Ayala, 576 U.S. 257, 269 (2015) (citing Fry v.

Pliler, 551 U.S. 112, 119 (emphasis in original)). "[A] state-court decision is not unreasonable if

"'fairminded jurists could disagree' on [its] correctness." Harrington v. Richter, 562 U.S. 86, 101

(2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

The appellate court concluded that although some inadmissible hearsay evidence had been

introduced by the prosecution's gang expert, it was harmless because the evidence was clearly not

used to determine guilt. The jury rejected the gang enhancement allegations and acquitted

Petitioner of the attempted robberies in Counts III and IV. Based on this fact alone, the Court

cannot conclude that no fair-minded jurist would agree with the appellate court's determination.

Furthermore, the state court concluded that it was the defendants' actions that were

determinative of guilt, not the gang evidence. The court noted that Petitioner had directed his

accomplices to attack Alex.  Working in concert, they held Alex on the ground while his property was taken.  The three then approached Brittany and Tylor.  Petitioner and Garcia chased Tylor into the park while Koplen threatened Brittany with a knife.  Koplen then ran to the park and rejoined the group whereupon Tylor was fatally stabbed.  The three then returned together and continued to intimidate Brittany.  It is clear that the overwhelming evidence of defendants' own actions led to the jury's conclusion that Petitioner aided and abetted in the charged crimes.  The state court reasonably determined that the admission of gang evidence did not have a substantial and injurious effect or influence in determining the jury's verdict.

Petitioner is not entitled to habeas relief because the state court's decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent.  The claim should be denied.

### 12.    Bifurcation of Gang Enhancements

Next, Petitioner claims the trial court erred in refusing to order bifurcation of the gang allegations.  Petitioner presented this claim on direct appeal, and it was denied by the Fifth DCA as follows:

> **VIII.  The Failure To Bifurcate The Gang Allegations Did Not Cause A Fundamentally Unfair Trial And The *Sanchez* Error Was Harmless.**
>
> Prior to trial, appellants sought bifurcation of the gang allegations (§ 186.22, subd. (b)(1)) from the substantive charges. The trial court denied bifurcation.
>
> Gang evidence was introduced at trial. The prosecution's gang expert discussed the history of the Norteño criminal street gang, including its development in the Modesto area, its color (red) and its other identifying marks. The expert explained how a person becomes a Norteño member, how the gang is organized, and he discussed the gang's rivals. The expert informed the jury about the types of crimes the gang commits, including drug sales, assaults, robberies and murders. According to the expert, if a group of younger gang members (foot soldiers) were together and one was involved in an altercation, the others would be expected to assist. The expert discussed two predicate offenses committed by other Norteño gang members. One conviction involved a burglary and the other was an assault with a deadly weapon.
>
> At trial, the prosecution's gang expert reviewed prior gang-related incidents for each appellant. The gang expert detailed six incidents involving Koplen. These included his association with known gang members, a school fight, underage drinking, and an arrest for a probation violation. The jury heard about five incidents involving Garcia. These included association with known gang members and a curfew violation. The expert discussed 16 incidents involving Segura. These involved assault, vandalism, association with known gang members, possessing marijuana, underage drinking, and an attempted vehicle theft. The expert relied on these prior

incidents in opining appellants were Norteño gang members when these crimes occurred.

In separate but related arguments, appellants claim the trial court prejudicially abused its discretion when it denied bifurcation of the gang allegations. They assert the gang evidence was not relevant. They further contend the bifurcation ruling resulted in "gross unfairness" amounting to a denial of due process. They rely on *People v. Albarran* (2007) 149 Cal.App.4th 214, 57 Cal.Rptr.3d 92 (*Albarran*). Finally, they argue *Sanchez* error occurred at trial because the prosecution relied on testimonial hearsay to establish the prior gang-related incidents for each appellant.

We agree *Sanchez* error occurred. Without recounting each disputed piece of evidence, it is clear the prosecution's gang expert based his opinions, at least in part, on "case-specific facts" about appellants. These facts were asserted by other law enforcement personnel and appeared in reports relating to potential criminal activity. These statements were not made in the context of an ongoing emergency. As such, these statements were "testimonial" hearsay and violated the confrontation clause. (*Crawford v. Washington* (2004) 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177; *Sanchez, supra*, 63 Cal.4th at pp. 685–686, 694, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Consequently, these statements should not have been introduced at trial and we must analyze prejudice.

A federal constitutional error is harmless under *Chapman, supra*, 386 U.S. 18, 87 S.Ct. 824, when the reviewing court determines beyond a reasonable doubt the error did not contribute to the verdict. (*People v. Aranda, supra*, 55 Cal.4th at p. 367, 145 Cal.Rptr.3d 855, 283 P.3d 632.) An error did not contribute to the verdict when the record reveals the error was unimportant in relation to everything else the jury considered on the issue in question. (*Yates v. Evatt, supra*, 500 U.S. at p. 403, 111 S.Ct. 1884.) The inquiry is whether the guilty verdict rendered in this trial was "surely unattributable to the error." (*Sullivan v. Louisiana, supra*, 508 U.S. at p. 279, 113 S.Ct. 2078.)

We determine the *Sanchez* error was harmless. In addition, we conclude the introduction of the remaining gang-related evidence neither caused a fundamentally unfair trial nor was prejudicial. As such, we need not analyze whether the court abused its discretion in denying bifurcation prior to trial. Instead, we can resolve the gang-related appellate issues through harmless error analysis.

. . . .

**C. *Albarran, supra*, 149 Cal.App.4th 214, 57 Cal.Rptr.3d 92, does not assist appellants.**

Appellants contend that, even if the trial court's bifurcation ruling was not an abuse of discretion, the denial of bifurcation resulted in "gross unfairness" amounting to a denial of federal due process. They rely on (*Albarran, supra*, 149 Cal.App.4th 214, 57 Cal.Rptr.3d 92.) Their arguments and reliance on *Albarran* are unavailing.

In *Albarran*, two males shot guns at a house. (*Albarran, supra*, 149 Cal.App.4th at p. 217, 57 Cal.Rptr.3d 92.) The witnesses had trouble identifying the males for law enforcement. About six weeks later, two witnesses selected the defendant's photo from a lineup. (*Id*. at p. 219, 57 Cal.Rptr.3d 92.) At trial, the jury learned the defendant made incriminating statements to an arresting deputy, which tended to establish his participation in the shooting. (*Ibid*.) The defendant, however, presented an alibi defense from family members and friends who testified he was present at a

party when this shooting occurred. (*Id.* at p. 221, 57 Cal.Rptr.3d 92.)

Prior to trial, the trial court had ruled the prosecution could introduce gang evidence, determining it was relevant to the charged gang enhancements and also to the issues of motive and intent for the underlying charges. (*Albarran, supra*, 149 Cal.App.4th at pp. 219–220, 57 Cal.Rptr.3d 92.) At trial, two deputies, along with the prosecution's gang expert, testified the defendant was a member of the 13 Kings street gang. (*Id.* at p. 220, 57 Cal.Rptr.3d 92.) The gang expert detailed the defendant's gang involvement, his tattoos (including one referencing the Mexican Mafia), and his gang moniker. (*Ibid.*) The expert described the history of the defendant's gang involvement. The expert identified other 13 Kings gang members by name and identified the types of crimes this gang had committed. (*Id.* at pp. 220–221, 57 Cal.Rptr.3d 92.) During closing argument, the prosecutor made a number of references to the defendant's gang involvement, arguing the crime was gang motivated and, because he was a gang member, the defendant's alibi was unbelievable. (*Id.* at p. 222, 57 Cal.Rptr.3d 92.) The jury found the defendant guilty for some of the charged offenses and found the gang enhancement allegations true. (*Ibid.*) However, the trial court later determined insufficient evidence had supported the gang findings, which were dismissed without prejudice. (*Ibid.*)

On appeal, a divided *Albarran* court held that, even if some of the gang evidence had been relevant regarding motive and intent, other irrelevant and inflammatory gang evidence had been admitted. The jury heard at length about other 13 Kings gang members, the wide variety of crimes they had committed, and the numerous contacts between the police and members of this gang. The prosecution's gang expert described a specific threat 13 Kings had made to kill police officers. The jury heard reference to the Mexican Mafia. (*Albarran, supra*, 149 Cal.App.4th at pp. 227–228, 57 Cal.Rptr.3d 92.) The majority concluded a real danger existed that the jury, regardless of actual guilt, would want to punish the defendant based on an improper inference he had committed past crimes and posed a threat to the police and society in general. (*Id.* at p. 230, 57 Cal.Rptr.3d 92.) The *Albarran* majority concluded the case was "one of those rare and unusual occasions where the admission of evidence ... violated federal due process and rendered the defendant's trial fundamentally unfair." (*Id.* at p. 232, 57 Cal.Rptr.3d 92.) Given the nature and amount of this gang evidence, the number of witnesses who testified about the gang evidence, and the role the gang evidence played in the prosecutor's argument, the divided appellate court held the trial court had erred in failing to grant the defendant a new trial on all of the charges. (*Ibid.*)

*Albarran* is distinguishable. The failure to bifurcate the gang evidence in this matter did not result in a denial of due process. Unlike in *Albarran*, the evidence in this matter connected appellants to the charged crimes and overwhelmingly established their guilt. Appellants' coordinated actions established their intent to aid and abet each other. Forensic evidence linked Koplen and Garcia to Tylor's murder in count I. Forensic evidence also linked Garcia to Alex's robbery in count II. Segura fled when police tried to apprehend him. His flight was a strong indicator of guilt. (§ 1127c.) Appellants' respective guilt was abundantly established. There was little or no danger the gang evidence caused the jury to want to punish them even if they were not guilty. This is not one of those "rare and unusual occasions" in which the admission of gang evidence resulted in gross unfairness. (*Albarran, supra*, 149 Cal.App.4th at p. 232, 57 Cal.Rptr.3d 92.) *Albarran* does not dictate reversal.

Further, Segura called his own gang expert to testify in this matter. Segura's expert opined that Segura's past gang contacts were social and not criminal. Segura's gang expert opined that Segura was not a Norteño gang member and these crimes were not gang related. In addition, the defense extensively cross-examined the

prosecution's gang expert. As made clear in closing argument, appellants established that they never made gang signals, they did not yell out gang slurs, these crimes were not done in retaliation for something gang related, the fight with Alex started because of a girl, and, (except for Segura), they did not wear gang colors.

During the prosecutor's closing argument, she contended appellants acted as a "gang" and a "pack" when they committed these crimes. However, she never discussed with the jury any of the gang evidence in general or appellants' specific prior gang-related incidents. Instead, she argued her expert was more qualified to render opinions than Segura's gang expert. She asked the jury to find true the gang enhancement allegations.

During her rebuttal, the prosecutor again said appellants worked as a "pack" and a "group" when they committed the charged crimes. She briefly noted Segura had shown a "pattern" leading to the present crimes, and she commented on the dispute between the two gang experts. However, she neither discussed the gang evidence in general nor appellants' prior gang-related incidents.

The jury rejected the gang enhancement allegations in this matter. In addition, the jury acquitted Garcia and Segura of attempted robbery against Tylor and Brittany (counts III and IV, respectively). This record does not demonstrate that the jury's passions were inflamed by the introduction of the gang evidence. To the contrary, it is apparent the jury did not use the gang evidence as an impermissible basis to find guilt. (See, e.g., *People v. Williams* (2009) 170 Cal.App.4th 587, 613, 88 Cal.Rptr.3d 401 [rejecting argument admission of gang evidence was prejudicial after jury acquitted defendant of a greater charge and found not true a gang enhancement allegation].) In any event, we have no doubt the jury would have reached the same verdicts had the trial court bifurcated the gang enhancement allegations. (*Ibid*.)

Based on this record, it is beyond a reasonable doubt the gang evidence, including the People's reliance on otherwise inadmissible testimonial hearsay, was unimportant in relation to everything else the jury considered regarding appellants' respective guilt. (See *Yates v. Evatt, supra*, 500 U.S. at p. 403, 111 S.Ct. 1884.) The guilty verdicts rendered in this trial were surely unattributable to both the trial court's bifurcation ruling and the *Sanchez* error. (See *Sullivan v. Louisiana, supra*, 508 U.S. at p. 279, 113 S.Ct. 2078.) The admission of the gang evidence did not render this trial fundamentally unfair. As such, we reject appellants' due process challenges. We can declare beyond any reasonable doubt the introduction of the gang evidence was harmless. (See *Chapman, supra*, 386 U.S. at p. 24, 87 S.Ct. 824.) Accordingly, we will not reverse appellants' convictions based on the *Sanchez* error or the failure to bifurcate the gang enhancement allegations.

Koplen, 2019 WL 2647356, at *29-30, 32-33.

        a.      Legal Standard and Analysis

There is no clearly established Federal law which holds that joinder or consolidation of charges may violate the Constitution. In United States v. Lane, 474 U.S. 438, 446 n. 8 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Instead, misjoinder would rise to the level of a constitutional violation only if it

results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."

However, in <u>Young v. Pliler</u>, the Ninth Circuit stated:

> <u>Lane</u> considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. See <u>Lane</u>, 474 U.S. 438, 446 & n. 9, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, <u>Lane's</u> broad statement-found in a footnote without citation to any legal authority-that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

<u>Young</u>, 273 Fed.Appx. 670, n. 1, 2008 WL 1757564 (9th Cir. 2008) (unpublished); <u>see also</u> <u>Collins v. Runnels</u>, 603 F.3d 1127, 1132–33 (9th Cir. 2010).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>. Given that there is no clearly established Federal law in this instance, the Court cannot grant relief, since habeas relief is triggered only when the state court adjudication runs afoul of clearly established federal law. <u>See</u> <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2009) (absent a Supreme Court decision that squarely addresses the issue it "cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent…and so we must defer to the state court's decision").

Even assuming, *arguendo*, that the Supreme Court's footnote could be considered clearly established Federal law, no constitutional violation occurred in this case, because the prejudice was not so great as to deny Petitioner his right to a fair trial. <u>Lane</u>, 474 U.S. at 446, fn. 8. The gang evidence in this case was insignificant in establishing Petitioner's guilt compared to the overwhelming evidence of Petitioner's and his accomplices' actions in aiding and abetting each other in the charged offenses. Moreover, the jury rejected the gang allegations in this matter. Therefore, the appellate court reasonably found that the guilty verdicts rendered in the case were unattributable to the bifurcation ruling. The claim should be rejected.

71

1        13.     Cumulative Error

2        In his final claim for relief, Petitioner alleges that the cumulative effect of the errors

3 deprived him of due process. In the last reasoned decision, the Fifth DCA denied the claim as

4 meritless, because the court had rejected all individual claims; therefore, there were no claims to

5 accumulate. <u>Koplen</u>, 2019 WL 2647356, at *49. "Multiple errors, even if harmless individually,

6 may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant." <u>Ceja</u>

7 <u>v. Stewart</u>, 97 F. 3d 1246, 1254 (9th Cir. 1996) (citing <u>Mak v. Blodgett</u>, 970 F.2d 614, 622 (9th

8 Cir. 1992)); <u>see also</u> <u>Karis v. Calderon</u>, 283 F.3d 1117, 1132 (9th Cir. 2002). However, the Ninth

9 Circuit has also recognized that where there is no single constitutional error, nothing can

10 accumulate to the level of a constitutional violation. <u>See</u> <u>Rup v. Wood</u>, 93 F.3d 1434, 1445 (9th

11 Cir. 1996). In this case, no errors occurred, and hence, there can be no cumulative error. Even if

12 errors occurred, a reasonable factfinder could have found that the cumulative effect of the alleged

13 errors did not prejudice Petitioner.

14 **IV.     RECOMMENDATION**

15        Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be

16 DENIED with prejudice on the merits.

17        This Findings and Recommendation is submitted to the United States District Court Judge

18 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

19 Local Rules of Practice for the United States District Court, Eastern District of California. Within

20 thirty (30) days after being served with a copy of this Findings and Recommendation, any party

21 may file written objections with the Court and serve a copy on all parties. Such a document

22 should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies

23 to the Objections shall be served and filed within fourteen (14) court days (plus three days if

24 served by mail) after service of the Objections. The Court will then review the Magistrate

25 Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file

26 /////

27 /////

28 /////

objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: __**April 27, 2021**__                    ___/s/ *Sheila K. Oberto*___
                                                      UNITED STATES MAGISTRATE JUDGE